643 F.2d 553
 1980-1 Trade Cases 63,239, 1980-81 Trade Cases 65,573
 STATE OF ARIZONA, Plaintiff-Appellant,
v.
MARICOPA COUNTY MEDICAL SOCIETY, an Arizona non-profit
corporation; Maricopa Foundation for Medical Care, an
Arizona non-profit corporation; Pima County Medical Society,
an Arizona non-profit corporation; and Pima Foundation for
Medical Care, an Arizona non-profit corporation,
Defendants-Appellees.
STATE OF ARIZONA, Plaintiff-Appellant,
v.
MARICOPA COUNTY MEDICAL SOCIETY, an Arizona non-profit
corporation; Maricopa Foundation for Medical Care, an
Arizona non-profit corporation; and Pima Foundation for
Medical Care, an Arizona non-profit corporation, Defendants-Appellees.
 Nos. 79-3427, 79-3612.
 United States Court of Appeals,
Ninth Circuit.
 March 20, 1980.
As Corrected April 26, 1980.
Rehearing Denied June 18, 1980.
 
 Patricia A. Metzger, Phoenix, Ariz., for plaintiff-appellant.
 Philip P. Berelson, Brown & Bain, Phoenix, Ariz., for defendants-appellees.
 Appeal from the United States District Court for the District of Arizona.
 Before SNEED and KENNEDY, Circuit Judges, and LARSON,* District Judge.
 SNEED, Circuit Judge:
 
 
 1
 These consolidated appeals derive from the plaintiff-appellant's injunctive suit[1] to halt alleged antitrust violations by the defendants-appellees, two foundations for medical care (FMCs),[2] and the county medical society associated with one of them. The challenged conduct is the setting by majority vote of maximum fees that physician members may claim in full payment for health services they provide to policyholders of FMC-approved insurance plans. The appellant State of Arizona appeals from the vacation of a temporary restraining order that had already been extended without a hearing beyond the usual period. It also appeals from denial of summary judgment on the issue of liability. Pursuant to 28 U.S.C. § 1292(b) the district court certified the question whether the FMC membership agreements, which contain the promise to abide by maximum fee schedules, are illegal per se under section 1 of the Sherman Act, 15 U.S.C. § 1. We have jurisdiction to answer the certified question, but do not reach the jurisdictional issue raised by the other appeal. We affirm.
 
 I.
 
 2
 Factual Background.
 
 
 3
 The FMCs in this case exemplify a type of organization that is beginning to play a significant part in the health services market. See C. Steinwald, An Introduction to Foundations for Medical Care (1971); Havighurst, Professional Restraints on Innovation In Health Care Financing, 1978 Duke L.J. 303, 315-16. The two challenged FMCs are not-for-profit corporations licensed as "insurance administrators" by the State of Arizona. Their activities include polling their members from time to time to set upper limits on fees they may charge patients covered by insurance plans the FMCs approve. This "price fixing," the FMCs claim, subserves a general purpose of setting minimum standards and performing peer review and administrative tasks for health insurance plans. Under the heading of peer review, the foundations evaluate the medical necessity and appropriateness of treatment given and, in some instances, the use of hospital services. They also serve as agents for the underwriters, drawing funds directly from insurers' bank accounts to pay doctors' bills. Participation in the foundations is open to all physicians licensed in Arizona.
 
 
 4
 The State of Arizona charges that the foundations' fee schedules have raised members' fees above the average and median fees charged by Arizona doctors. The foundations dispute the appropriateness of the statewide figures used for the comparison, but concede that eighty-five to ninety-five percent of physicians in Maricopa County bill at or above the maximum reimbursement levels set by the county FMC.[3] The foundations point out that the State's own maximum reimbursement levels for its worker's compensation insurance program and Comprehensive Medical/Dental Program for Foster Children are higher than the foundations'. Although the State primarily argues that the FMC membership agreements are contracts to fix prices, it hints that the FMCs serve a separate anticompetitive end by aiding the exchange of price information among doctors in the counties concerned. The State contends that the FMC fee schedules are not inseparable from the professional standards review of FMC-approved insurance plans, since the foundations offer peer review and administrative services for at least one health program the foster child program in which prices paid the doctors are not set by themselves but by the third party payor. Although the foundations say their purpose is to provide an alternative to "closed panel prepaid health insurance plans," which are sometimes called "health maintenance organizations" (HMOs), see Havighurst, Health Maintenance Organizations and the Market for Health Services, 35 Law & Contemp. Prob. 716 (1970), the record does not show that HMOs exist in Maricopa or Pima County or have been kept from entering the health service market in those counties by the operation of the FMCs.
 
 II.
 
 5
 The No. 79-3612 Appeal.
 
 
 6
 Our jurisdiction to consider the appeal in No. 79-3427 is based on 28 U.S.C. § 1292(b). As for the appeal in No. 79-3612, we note that the State of Arizona would be entitled to reinstatement of an originally proper preliminary injunction only if the court below, in dissolving it, had committed an abuse of discretion. The controlling standard is a sliding scale correlation of the "balance of hardships" with the likelihood that a permanent injunction will be granted. Benda v. Grand Lodge of International Association of Machinists, 584 F.2d 308, 314-15 (9th Cir. 1978), cert. dismissed, 441 U.S. 937, 99 S.Ct. 2065, 60 L.Ed.2d 667 (1979); William Inglis & Sons Baking Co. v. ITT Continental Baking Co., 526 F.2d 86, 88 (9th Cir. 1975). The State argued that without preliminary relief, its citizens would suffer pecuniary loss, and prospective patients who could not afford a physician's care at supracompetitive prices would suffer physical injury and mental distress. On the other hand, a preliminary injunction threatened the very existence of the FMCs. Given this balance of hardships and the uncertainties attending proof of the antitrust violation, which we consider below, we cannot say that the district court would have erred in dissolving a preliminary injunction.
 
 III.
 
 7
 The No. 79-3427 Appeal.
 
 A.
 
 8
 We must approach this appeal mindful that the Supreme Court has made it clear that the determination whether an agreement violates the Sherman Act turns on its "impact on competitive conditions." National Society of Professional Engineers v. United States, 435 U.S. 679, 688, 98 S.Ct. 1355, 1363, 55 L.Ed.2d 637 (1978). The fact that a restraint may for one or more reasons appear reasonable is not controlling. An unreasonable restraint that contravenes the Sherman Act may be "based either (1) on the nature and character of the contracts, or (2) on surrounding circumstances giving rise to the inference or presumption that they were intended to restrain trade and enhance prices." Id. at 690, 98 S.Ct. at 1364 (footnote omitted). The key, to repeat, is the agreement's impact on competition. If competition is promoted the agreement passes muster; if it suppresses or destroys competition it does not. Some agreements so often lack redeeming virtue, so frequently suppress or destroy competition, as to warrant their classification as per se unreasonable. Broadcast Music, Inc. v. Columbia Broadcasting Co., 441 U.S. 1, 7-8, 99 S.Ct. 1551, 1554, 60 L.Ed.2d 1 (1979). Once so classified a violation of the Sherman Act is made out merely by proving that such an unworthy agreement exists. Actual proof of its competitive impact is unnecessary. It is presumed to be anticompetitive.
 
 
 9
 The State of Arizona insists that the practice of setting maximum fees by majority vote of the members of the FMC constitutes an arrangement without redeeming virtue that suppresses and destroys competition and is thus unreasonable per se. The difficulty with Arizona's position is that this record reveals nothing about the actual competitive effects of the challenged arrangement nor do the authorities, primary or secondary, afford assurance concerning its competitive impact. In truth, we know very little about the impact of this and many other arrangements within the health care industry. This alone should make us reluctant to invoke a per se rule with respect to the challenged arrangement.
 
 
 10
 There are, however, additional reasons. Foremost among them is that we are uncertain about the competitive order that should exist within the health care industry pursuant to the Sherman Act as interpreted by the courts. Only recently have the professions been brought by the Supreme Court within the reach of the Act. Goldfarb v. Virginia State Bar, 421 U.S. 773, 785-88, 95 S.Ct. 2004, 2012-13, 44 L.Ed.2d 572 (1975). The guidelines by which each is governed pursuant to the Act are being written on a case by case basis.
 
 
 11
 The health care industry, moreover, presents a particularly difficult area. The first step to understanding is to recognize that not only is access to the medical profession very time consuming and expensive both for the applicant and society generally, but also that numerous government subventions of the costs of medical care have created both a demand and supply function for medical services that is artificially high. The present supply and demand functions of medical services in no way approximate those which would exist in a purely private competitive order. An accurate description of those functions moreover is not available. Thus, we lack baselines by which could be measured the distance between the present supply and demand functions and those which would exist under ideal competitive conditions.
 
 
 12
 Perforce we must take industry as it exists, absent the challenged feature, as our baseline for measuring anticompetitive impact. The relevant inquiry becomes whether fees paid to doctors under that system would be less than those payable under the FMC maximum fee agreement. Put differently, confronted with an industry widely deviant from a reasonably free competitive model, such as agriculture, the proper inquiry is whether the practice enhances the prices charged for the services. In simplified economic terms, the issue is whether the maximum fee arrangement better permits the attainment of the monopolist's goal, viz., the matching of marginal cost to marginal revenue, or in fact obstructs that end.
 
 
 13
 Approached in this manner, the weakness of Arizona's suggestion that a per se rule be employed here becomes apparent. To assume that the arrangement in question wrongfully increases fees requires the further assumption that the FMCs are but devices to enable the member doctors to capture a greater share of potential monopoly profit, which their monopoly power makes available, than otherwise would be possible. This is an assumption we are not prepared to make on the basis of the record before us.
 
 
 14
 Our reluctance also has other roots. We are not, for example, prepared to believe without some evidence that a conspiratorial exploitation of monopoly power by the doctors would be supinely accepted by the insurance carriers. Nor are we prepared to reject out of hand the claim that a ceiling on fees does in fact reduce them. No one suggests that peer review is suspect, although it too purports to reduce the aggregate costs of medical services by curtailing unnecessary treatment. If it is proper to assume a conspiratorial exploitation with respect to maximum fees, why should a different assumption be applicable to peer review? Our belief is that neither assumption is appropriate.[4]
 
 
 15
 We are by no means unaware that economic motives frequently lie behind even the best of good works. We are, however, simply not prepared to brand the appellees' conduct as "price-fixing" and thus a per se violation of the Sherman Act on the basis of an unsupported belief that fee enhancement is the likely consequence of the appellees' maximum fee arrangement. We say this in full recognition that the appellees' conduct involves some exchange of price information from which an agreement to raise or maintain prices might be implied if sufficient corroborative facts were shown. See Maple Flooring Assn. v. United States, 268 U.S. 563, 586, 45 S.Ct. 578, 586, 69 L.Ed. 1093 (1925). An agreement of that nature properly proven would violate section 1 of the Sherman Act. To affix the per se label to appellees' conduct is, however, once more to substitute an unsupported belief for proper proof.
 
 
 16
 We acknowledge that it is quite possible, perhaps even probable, that the price ceiling serves the purpose of forestalling government price control that could force prices to an even lower level. This does not make the ceiling a violation of the Sherman Act. To eschew profit maximization in order to forestall price control is neither irrational nor, under the facts of this record, in violation of the Act. We observe in passing that only a government lost in an impenetrable legal maze, after having contributed substantially to the creation of monopoly conditions, would threaten price control if full monopoly profits are reaped and enforcement of the antitrust laws if private means are used to prevent the harvest.
 
 B.
 
 17
 Appellant argues that our position is impermissible because under United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 221, 60 S.Ct. 811, 843, 84 L.Ed. 1129 (1940), any collective effort to "tamper with price structures" offends antitrust policy. The argument, while by no means fanciful, overlooks Broadcast Music which held that a traditional form of minimum price fixing in the market for music under copyright was not illegal per se. Broadcast Music reminds us that whether to classify something as " 'per se price fixing' . . . will often, but not always, be a simple matter." 441 U.S. at 9 & n.14, 99 S.Ct. 1557 & n.14 (emphasis added).
 
 
 18
 The issue whether to so classify the price schedules in this case is by no means "a simple matter." In addition to the uncertainties already referred to, we do not know how health insurers such as Blue Cross fix their fee schedules in the relevant geographical area or whether the fees they offer exceed the appellees' maximum fees. We are not informed by the record of the identity of, or the role played by, the various institutional components that compete in the relevant market. One may guess that doctors, both within and without the FMC structure, insurance carriers, hospitals, and perhaps HMOs, operate within the market; nonetheless, the record reveals nothing about the nature and extent of the competition between them. This makes it impossible to evaluate the pro- and anticompetitive aspects of a given feature of the total structure, although these aspects must be weighed together in determining whether a per se rule, or even the Rule of Reason, should brand the questioned feature illegal.[5]
 
 
 19
 Our unwillingness to employ a per se rule in this case is not overcome by the suggestion of a well-informed commentator that FMCs could and, perhaps in some instances, have unfairly prevented HMOs from recruiting subscribers and thus gaining entry to the relevant health service market. Havighurst, Health Maintenance Organizations and the Market for Health Services, 35 Law & Contemp. Prob. 716, 767-76 (1971). The thought is that FMCs, far from extracting the maximum profit possible, have set fees sufficiently low to discourage entry by potential competitors such as HMOs. See Knutson v. Daily Review, Inc., 548 F.2d 795, 814 n.21 (9th Cir. 1976) ("If the fixed maximum price is higher than cost but lower than a price that would permit new entrants or smaller scale competitors to operate (i. e., a 'limit price'), then, although not predatory, it could support other efforts to acquire a monopoly.") (dictum). Some have questioned the theory on which the thought rests. See R. Posner, Antitrust Law: An Economic Perspective 115 n.50 (1976); for a detailed critique of the limit-price theory, see Markovits, Potential Competition, Limit Price Theory, and the Legality of Horizontal and Conglomerate Mergers Under the American Antitrust Laws, 1975 Wis.L.Rev. 658. Doubt springs from the fact that the returns to those possessing monopoly power from pursuing a policy of fixing prices sufficiently low to discourage the entry of competitors are likely to be less over the long run than those resulting from a pricing policy that permits the capture of monopoly profits. In the latter case, high profits likely will draw competitors whose entry will drive prices down to a point approximating that which would have been set by a policy designed to bar entry. Thus, either policy over time yields approximately the same price level, the difference being that in the latter case available monopoly profits were captured while in the former they were foregone. Knowingly to forego such profits is irrational. This so-called "limit-price" theory, therefore, cannot be accepted as the foundation of a per se rule.
 
 
 20
 Our conclusion in this regard does not conflict with the general disapproval of predatory practices, of which predatory pricing is the most commonly examined species. See, e. g., Utah Pie Co. v. Continental Baking Co., 386 U.S. 685, 87 S.Ct. 1326, 18 L.Ed.2d 406 (1967); R. Posner, supra, at 184-96 (1976); L. Sullivan, Handbook of the Law of Antitrust 108-13 (1977); Areeda & Turner, Predatory Pricing and Related Practices Under Section 2 of the Sherman Act, 88 Harv.L.Rev. 697 (1975); Cooper, Attempts and Monopolization: A Mildly Expansionary Answer to the Prophylactic Riddle of Section Two, 72 Mich.L.Rev. 373, 435-40 (1974); Williamson, Predatory Pricing: A Strategic and Welfare Analysis, 87 Yale L.J. 284 (1977). As these authorities illustrate, however, there is nothing like agreement concerning the signs by which predation is identifiable.[6] Without deciding what the proper identifying signs may be, we are confident that none is revealed by this record. Moreover, the evil of predatory pricing is that it makes possible an ultimate capture of monopoly profits. Were prices maintained at the predatory level indefinitely the case against predatory pricing would more resemble that against suicide than that against monopolies.
 
 
 21
 The question whether the practice of which the appellant complains is sheltered from antitrust challenge by the McCarran-Ferguson Act, 15 U.S.C. § 1012, is not before us.[7] For the purposes of this appeal we assume that the practice of which the appellant complains was not "the business of insurance." No more was held with respect to the practice involved in Royal Drug. The issue whether that practice violated the antitrust laws expressly was not decided. Here we confront precisely that type of issue and merely hold that the challenged practice is not a per se violation.
 
 
 22
 We conclude by observing that we draw comfort from the Supreme Court's reiteration in National Society of Professional Engineers, supra, 435 U.S. at 696 n.22, 98 S.Ct. at 1367 n.22, of its statement in Goldfarb v. Virginia State Bar, 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975) that marketing restraints that regulate professional competition may pass muster under the Rule of Reason even though similar restraints on ordinary business competition would not. We believe this recognizes that a restraint may serve the public, the transcendent end of all professions, even though its presence in a purely commercial setting would violate the antitrust law. See Professional Engineers, supra, 435 U.S. at 696 & n.22, 98 S.Ct. at 1367 & n.22; Boddicker v. Arizona State Dental Ass'n, 549 F.2d 626 (9th Cir. 1977). There is sufficient probability of the challenged practice in this case being sheltered by this principle to justify our refusal to brand it as a per se violation.
 
 
 23
 Affirmed.
 
 KENNEDY, Circuit Judge, concurring:
 
 24
 I agree with my Brother Sneed that we know too little about the effects on competition produced by the practices here in question to brand them per se violations of the Sherman Act at this point. "It is only after considerable experience with certain business relationships that courts classify them as per se violations . . ." United States v. Topco Associates, Inc., 405 U.S. 596, 607-08, 92 S.Ct. 1126, 1133, 31 L.Ed.2d 515 (1972). We lack that experience in judging the maximum reimbursement schedules present here; and I am unable, for the reasons set forth in Judge Sneed's opinion, to say that these schedules "on (their) face (have) the effect, or could have been spurred by the purpose, of restraining competition among the individual (physicians)." Broadcast Music, Inc. v. Columbia Broadcasting System, Inc., 441 U.S. 1, 13, 99 S.Ct. 1551, 1559, 60 L.Ed.2d 1 (1979); Northern Pac. Ry. Co. v. United States, 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958).
 
 
 25
 While the Supreme Court has rejected any blanket antitrust exemption for learned professions, see, e. g., Goldfarb v. State Bar, 421 U.S. 773, 785-88, 95 S.Ct. 2004, 2012-13, 44 L.Ed.2d 572 (1975), it has indicated that the antitrust laws may have somewhat different applications to some trade practices in those areas. See, e. g., National Society of Professional Engineers v. United States, 435 U.S. 679, 696 n.22, 98 S.Ct. 1355, 1367 n.22, 55 L.Ed.2d 637 (1978). Per se rules should be derived from considerations of economic impact in particular cases illustrating the category of prohibited acts, and therefore a trial is appropriate to explore further the impact on competition of the challenged reimbursement schedules.
 
 
 26
 This is not to suggest, however, that I have found these reimbursement schedules to be per se proper, that an examination of these practices under the rule of reason at trial will not reveal the proscribed adverse effect on competition, or that this court is foreclosed at some later date, when it has more evidence, from concluding that such schedules do constitute per se violations. The evidence adduced at trial may very well show that the theories which Judge Sneed refutes in the abstract do have an empirical foundation and that the challenged practices have the proscribed effect of suppressing rather than promoting competition. See National Society of Professional Engineers v. United States, supra, 435 U.S. at 691, 98 S.Ct. at 1365.
 
 
 27
 There does not now appear to be a controlling or definitive analysis of the market impact caused by the arrangements under scrutiny in this case, but trial may reveal that the arrangements are, at least in their essentials, not peculiar to the medical industry and that they should be condemned. For the foregoing reasons I concur.
 
 
 28
 LARSON, Senior District Judge (dissenting).
 
 
 29
 I respectfully dissent from the majority decision. The defendants' conduct constitutes price-fixing that is per se illegal under the Sherman Act. In addition, the trial court abused its discretion in refusing to continue or grant the preliminary injunction.
 
 I.
 
 30
 We are presented with two consolidated appeals by the State of Arizona. No. 79-3427 was brought pursuant to 28 U.S.C. § 1292(b). The controlling question of law certified was whether the challenged practice should be judged under a per se rule or by the rule of reason. No. 79-3612 is an appeal from a district court order of July 17, 1979, which in essence was a refusal to continue an injunction. The majority opinion reaches only the first appeal, noting, however, that it cannot be said that "the district court would have erred in dissolving a preliminary injunction." I believe both appeals can and must be treated fully.
 
 
 31
 The complaint in this action was filed on October 17, 1978. Arizona moved for a preliminary injunction on October 25, 1978, but no hearing was held on this motion before the events which led to these appeals. On November 2, 1978, the parties agreed to an order establishing the sequence of discovery and pretrial motions. Paragraph 6 of this order forbade the defendants from engaging in allegedly illegal practices until the preliminary injunction motion was heard, or May 1, 1979, or until further order of the court. On April 20, 1979, Arizona moved to maintain the status quo past May 1, 1979. Defendants objected, but on April 30, 1979, the trial judge decided that Paragraph 6 of the November 2, 1978, order would remain in effect pending further order of the court. In a June 5, 1979, order and memorandum, defendants' motion to dismiss the complaint and plaintiff's motion for summary judgment on the issue of liability were denied by the district court. It was in this order that the district judge stated that the challenged conduct would be analyzed under the rule of reason rather than by a per se rule.
 
 
 32
 Following this decision, the defendants moved to vacate the April 30 order. On July 17, 1979, the district court granted this request. The district court appeared to view the continuation of Paragraph 6 of the November 2, 1978, order as either a temporary restraining order or "because of the lapse of time and the preparation of the parties, as an application for a preliminary injunction."
 
 
 33
 This July 17, 1979, order was appealed pursuant to 28 U.S.C. § 1292(a)(1), which allows review of interlocutory orders "granting, continuing, modifying, refusing or dissolving injunctions, or refusing to dissolve or modify injunctions." Grants or denials of temporary restraining orders are not appealable under this statute. In the Matter of Vuitton et Fils S.A., 606 F.2d 1, 3 (2d Cir. 1979); Levesque v. State of Maine, 587 F.2d 78, 79 (1st Cir. 1978); Sohappy v. Smith, 529 F.2d 570, 572 (9th Cir. 1976); 9 Moore's Federal Practice P 110.20(5) (2d ed. 1975). However, often the characteristics and circumstances of an order, not how it is denominated, determine whether it is appealable. See Sampson v. Murray, 415 U.S. 61, 85-88, 94 S.Ct. 937, 950-51, 39 L.Ed.2d 166 (1974); Melanson v. John J. Duane Co., 605 F.2d 31, 33 (1st Cir. 1979); Clements Wire & Mfg. Co. v. NLRB, 589 F.2d 894, 896-97 (5th Cir. 1979); Moore's Federal Practice, supra. This order was continued for over eight months. That fact alone might require that it be treated as a preliminary injunction. See Sampson v. Murray, supra, 415 U.S. at 86, 94 S.Ct. at 951. The district court believed it could be so viewed, and the defendants, when requesting vacation of the order, argued that it was in effect a preliminary injunction. In addition, there had already been extensive consideration of the merits by the district court. The July 17 order was the denial or dissolution of a preliminary injunction and is therefore appealable.
 
 
 34
 The general standard for reviewing grants or denials of preliminary injunctions is whether the trial court abused its discretion. Miss Universe, Inc. v. Flesher, 605 F.2d 1130, 1132-33 (9th Cir. 1979); City of Anaheim v. Kleppe, 590 F.2d 285, 288 n.4 (9th Cir. 1978). A decision based on an erroneous legal premise would also be reversible. Miss Universe, Inc. v. Flesher, supra; Kennecott Copper Corp., Nevada Mines v. Costle, 572 F.2d 1349, 1357 n.3 (9th Cir. 1978); Klaus v. Hi-Shear Corp., 528 F.2d 225, 231 (9th Cir. 1975). See Chromalloy American Corp. v. Sun Chemical Corp., 611 F.2d 240, 244 (8th Cir. 1979); State of Kansas ex rel. Stephan v. Adams, 608 F.2d 861, 867 n.5 (10th Cir. 1979); Jack Kahn Music Co. v. Baldwin Piano & Organ Co., 604 F.2d 755, 758 (2d Cir. 1979). As discussed in detail below, I believe the district court was legally wrong in declining to apply a per se rule to defendants' conduct.[1] Even if the district court was correct in applying the rule of reason, it was, however, an abuse of discretion to refuse to prolong the injunction and the status quo.
 
 
 35
 The test for awarding preliminary injunctions has undergone considerable evolution in recent decisions.[2] This history is traced in City of Anaheim v. Kleppe, supra. Currently there are two tests which are viewed as the extremes of a continuum.[3] The moving party must show either (1) probable success on the merits and possible irreparable injury or (2) sufficiently serious questions going to the merits to create a fair ground for litigation and a balance of hardships tipping decidedly toward the moving party. Anderson v. United States, 612 F.2d 1112, 1116 (9th Cir. 1979); Miss Universe, Inc. v. Flesher, supra, at 1134. As the balance of hardships increases in favor of the moving party, the necessity of showing a likelihood of success on the merits decreases. City of Anaheim v. Kleppe, supra. A final factor present in the decision whether to award preliminary relief is an evaluation of where the public interest lies. City of Anaheim v. Kleppe, supra.
 
 
 36
 The district judge declined to continue the injunction because he thought the balance of harms favored defendants. The defendant Foundations claimed only that physicians were threatening to withdraw if they could not increase the fees they recovered from third-party payors. A simple alternative was available for defendants to preserve their membership and avoid injury. They could suspend the requirement that doctors accept the fee schedule amounts as the maximum payment for treatment of insurance-covered patients. The Foundations could continue to perform their other functions. The physicians who wished to raise their fees could do so, and would have no reason to leave the Foundations. In the event that a favorable result for the physicians is obtained in this litigation, the Foundations could proceed to establish a new fee schedule and reinstitute the requirement that its member physicians adhere to the schedule. This procedure would avoid the only harm a preliminary injunction would cause the defendant Foundations: loss of membership.
 
 
 37
 Arizona claimed that promulgation of a new fee schedule would mean substantial increases in medical costs for its residents. The district court believed that any harm to those whom Arizona represents could be compensated by money damages. Arizona is not seeking damages and in any event the expense of proving and disbursing the increased charges to individual patients would likely be greater than the amount of damages recovered. The additional medical costs to Arizona citizens would be unrecoverable and irreparable. The balance of harms tips strongly in Arizona's favor. In addition, the public interest would best be served by continuing to enjoin the defendants from preparing and using a new fee schedule. The fact that it is Arizona, the primary regulator of the health industry in that State and guardian of its citizens' interests, which has challenged defendants' conduct is also entitled to weight.
 
 
 38
 The district court also felt Arizona had not established a likelihood of success under the rule of reason, but it appears to me that plaintiff has shown a strong probability of success, even if forced to proceed under this standard. Fee-setting in this context is so obviously anticompetitive that it must be found to violate the Sherman Act. It is unquestioned that Arizona has at least raised serious questions about the legality of defendants' behavior. Therefore, wherever one chooses to stop along the continuum of preliminary injunction factors, Arizona is entitled to relief.
 
 II.
 
 39
 I turn now to the standard of liability by which the challenged activity should be measured. This inquiry can be handled most efficiently if guided by three questions. First, is this a type of "naked price restraint" which has previously been adjudged per se illegal? If so, then only some peculiarity of the health care industry can justify application of a lesser standard. See e. g., Silver v. New York Stock Exchange, 373 U.S. 341, 347, 83 S.Ct. 1246, 1251, 10 L.Ed.2d 389 (1963). Second, if this is not a form of conduct traditionally found to be per se illegal, does it possess such harmful features that it should now be declared per se illegal? See, e. g., Broadcast Music, Inc. v. Columbia Broadcasting System, Inc., 441 U.S. 1, 19-20 n.33, 99 S.Ct. 1551, 1562 n.33, 60 L.Ed.2d 1 (1979). Third, even if the rule of reason must be applied, is the practice so plainly anticompetitive that only a truncated rule of reason analysis need be carried out? See, e. g., National Society of Professional Engineers v. United States, 435 U.S. 679, 692, 98 S.Ct. 1355, 1365, 55 L.Ed.2d 637 (1978). The third question is relevant here because if answered in the affirmative, the likelihood of plaintiff's success, and the propriety of granting preliminary relief, would be increased.
 
 
 40
 Defendants formulated and dispersed relative value guides and conversion factor lists which together were used to set an upper limit on fees received from third-party payors. It is clear that these activities constituted maximum price-fixing by competitors. Disregarding any "special industry" facts, this conduct is per se illegal. Albrecht v. Herald Co., 390 U.S. 145, 151-53, 88 S.Ct. 869, 873, 19 L.Ed.2d 998 (1968); Kiefer-Stewart Co. v. Seagram & Sons, 340 U.S. 211, 213, 71 S.Ct. 259, 260, 95 L.Ed. 219 (1951); Kartell v. Blue Shield of Mass., Inc., 592 F.2d 1191, 1193 n.2 (1st Cir. 1979); Quinn v. Mobil Oil Co., 375 F.2d 273, 274, 276-78 (1st Cir.), cert. dismissed, 389 U.S. 801, 88 S.Ct. 8, 19 L.Ed.2d 56 (1967); Crane Distributing Co. v. Glenmore Distilleries, 267 F.2d 343, 345 (6th Cir. 1959); Vandervelde v. Put & Call Brokers & Dealers Assoc., 344 F.Supp. 118, 134 (S.D.N.Y.1972). Precedent alone would mandate application of the per se standard.
 
 
 41
 I find nothing in the nature of either the medical profession or the health care industry that would warrant their exemption from per se rules for price-fixing. Although the Supreme Court has distinctly rejected a broad learned professions exemption from the antitrust laws, National Society of Professional Engineers v. United States, supra, 435 U.S. at 696, 98 S.Ct. at 1367; Goldfarb v. Virginia State Bar, 421 U.S. 773, 787, 95 S.Ct. 2004, 2013, 44 L.Ed.2d 572 (1975), confusion remains over the extent to which these professions are or should be subject to per se rules. See generally Bauer, Professional Activities and the Antitrust Laws, 50 N.D. Lawyer 570 (1975); Note, The Professions & Non-commercial Purposes, 11 U.Mich.J. of L. Reform 387 (1978); Note, The Antitrust Liability of Professional Associations After Goldfarb, 1977 Duke L.J. 1047.
 
 
 42
 In Goldfarb, the district court found fee-setting by attorneys to be per se illegal. 355 F.Supp. 491, 493 (E.D.Va.1973). The Supreme Court stated that a "naked agreement was clearly shown, and the effect on prices is plain," and that "respondents' activities constitute a classic illustration of price fixing." 421 U.S. at 782, 783, 95 S.Ct. at 2010, 2011. Although not explicit, a valid interpretation of this language is that the Supreme Court agreed that the per se rule was applicable. Certainly this is not a rule of reason analysis. The Supreme Court did add a caveat that the "public service aspect, and other features of the professions, may require that a particular practice, which could properly be viewed as a violation of the Sherman Act in another context, be treated differently. We intimate no view on any other situation than the one with which we are confronted today." 421 U.S. 788-89 n.17, 95 S.Ct. at 2013 n.17. The situation with which the Court was confronted in Goldfarb price-fixing is the same practice challenged in this case.
 
 
 43
 National Society of Professional Engineers v. United States, supra, is also not totally explicit on the standard applied. Both the district court, 404 F.Supp. 457, 460-61 (D.D.C.1975), and the court of appeals, 181 U.S.App.D.C. 41, 46, 555 F.2d 978, 983 (D.C.Cir.1977), found the ban on competitive bidding to be per se illegal. Both courts believed this result was consonant with Goldfarb. The Supreme Court recognized that the lower courts had found the practice unlawful on its face, 435 U.S. at 686, 98 S.Ct. at 1362, and it agreed with that assessment, 435 U.S. at 692-693, 98 S.Ct. at 1365-1366. The central lesson of the case appears to be that when the nature and character of an agreement among professionals is plainly anticompetitive, no extended analysis is necessary to find it forbidden under the Sherman Act. I believe that in the wake of Goldfarb and National Society of Professional Engineers, the Supreme Court would be willing to apply per se rules to professional price tampering and that this Court should not hesitate to do so.
 
 
 44
 Such an approach would be in accord with the rulings of other courts. See United States v. Texas State Board of Public Accountancy, 464 F.Supp. 400, 402-03 (W.D.Tex.1978) (competitive bidding ban is per se illegal), aff'd, 592 F.2d 919 (5th Cir.), cert. denied, 444 U.S. 925, 100 S.Ct. 262, 62 L.Ed.2d 180 (1979); Veizaga v. National Board for Respiratory Therapy, (1977-1) Trade Cases (CCH) P 61,274 (N.D.Ill.1977) (per se rule applied to commercial activity of a profession). Commentators have suggested that the commercial aspects of the professions, including medicine, should be subject to customary per se rules. See Horan & Nord, Application of Antitrust Law to the Health Care Delivery System, 9 Cumberland L.Rev. 685, 700 (1979); Weller, Medicaid Boycotts & Other Maladies from Medical Monopolists, 11 Clearinghouse Rev. 99, 104 (1977); Note, The Professions & Non-commercial Purposes, supra, at 399 and n.36, 414-15. Several authors have advocated that price-fixing by physicians, including maximum fee-setting, be declared per se illegal. See Havighurst & Kissam, The Antitrust Implications of R.V. Studies in Medicine, 4 J. Health Politics, Policy & Law 48, 75 (1979); Horan & Nord, supra, at 709; Kallstrom, Health Care Cost Control by Third-Party Payors, 1978 Duke L.J. 645, 683.
 
 
 45
 The defendants' price-fixing has a wholly commercial nature and has no relation to any public service aspect of the medical profession, or to any other professional objective of the defendants; nor does it appear to be motivated by a desire to benefit consumers. Eliminating the fee-setting would not inhibit defendants from continuing to perform peer review, quality control, or other permissible functions. These activities are entirely separable from the fee-setting. That physicians are the participants in this price-fixing scheme does not exempt it from per se illegality.
 
 
 46
 A second exemption which might be advanced is one for the health care industry. Of course, Congress has not provided such an exemption and the courts should be extremely reluctant to imply one. Goldfarb v. Virginia State Bar, supra, 421 U.S. at 787, 95 S.Ct. at 2013. It is not necessary here to strike any broader rule than to deny special treatment to price-fixing by physicians. Whether other practices in the health care business are due deferential handling can be decided when those activities are placed at issue.
 
 
 47
 Much attention has recently been focused on health care delivery, with particular concern over the seemingly uncontrollable increases in health care costs. Congress has examined the serious problems existing in the industry and has studied the potential benefits of introducing competitive forces.[4] Government agencies also have shown interest in the competitive state of health care.[5] A number of articles and books have been written on the subject.[6] The Supreme Court has even noted the problem in a recent case, Group Life & Health Ins. Co. v. Royal Drug Co., 440 U.S. 205, 232 n.40, 99 S.Ct. 1067, 1083 n.40, 59 L.Ed.2d 261 (1979).[7]
 
 
 48
 The health care industry currently does not display significant competitive conditions. There are many reasons for this situation, including the tax laws, the effects of insurance, and, as the majority notes, governmental regulation and financial entanglement. It is also undoubtedly true that a major factor has been the active suppression of competition by traditional medical associations.[8] The restraints fostered by these groups are and should be subject to conventional antitrust scrutiny. Although market forces may be bridled in part by factors beyond the reach of the Sherman Act, this does not prevent utilization of the law to remove additional constraints which normally are illegal. Partial governance by competitive forces can create benefits even though anticompetitive forces remain in the market.
 
 
 49
 It is not our task to determine what the competitive order should be. The Sherman Act requires that absent very unusual circumstances market forces should be given free rein. The policy decision that competition is in the public interest has been made by Congress and must be enforced by the courts. National Society of Professional Engineers v. United States, supra, 435 U.S. at 692, 695, 98 S.Ct. at 1365, 1367. Furthermore, "(E)arly cases also foreclose the argument that because of the special characteristics of a particular industry, monopolistic arrangements will better promote trade and commerce than competition. That kind of argument is properly addressed to Congress . . . ." Id. at 689, 98 S.Ct. at 1364 (cites omitted).
 
 
 50
 We are confronted here with a challenge to behavior usually found per se illegal under the antitrust laws. Nothing in the arguments advanced by defendants or by the majority opinion convinces me that application of the procompetitive policy of the Sherman Act to physician price-fixing will be harmful to the health care business or to its consumers. On the contrary, vigorous enforcement of the law could encourage new forms of health care delivery that would significantly benefit the public.[9] Some initial steps toward reform have been made in medicine. See In the Matter of A.M.A., F.T.C. Docket No. 9064, Trade Reg. Rpts. No. 409 Pt. II (CCH) (Oct. 30, 1979) (forbidding advertising and price restraints). The majority opinion will hinder attempts by doctors, consumers and government to continue the process of applying Sherman Act principles to health care.
 
 
 51
 The alternative to increased competition, partly secured through private and government enforcement of the antitrust laws, is probably total government control.[10] Few people consider this an appealing option. The choice, however, is not ours to make. We need only follow the mandate of the Sherman Act, which requires that competitive forces be allowed free rein. Only Congress can declare that health care is to be exempted from this mandate.
 
 
 52
 It might be argued that the challenged practice should not now be judged under a per se rule because courts have not yet had enough experience with this type of restraint to form a clear judgment about its competitive effects. See Broadcast Music, Inc. v. Columbia Broadcasting System, Inc., supra.[11] This appears to be the thrust of the majority opinion. Such an argument is inappropriate here, because courts long ago determined that price tampering and maximum price-fixing among competitors lack significant competitive virtues and are therefore per se illegal. Even if this were the first judicial examination of this form of restraint, its anticompetitive vices are egregious and its procompetitive features nonexistent, so that this Court could declare it to be within the per se rules.[12]
 
 
 53
 Three of the harms engendered by maximum fee-setting are elimination of the freedom of individual sellers and buyers to determine prices, the possibility that the "maximum" price is in reality being used to establish a price floor or price uniformity, and the use of a maximum price structure to inhibit entry of competing forms of health care delivery which might capture a significant market share and deflect income from traditional fee-for-service physicians. See Albrecht v. Herald Co., supra, at 152-53; L. Sullivan, Handbook on the Law of Antitrust § 78, p. 210-11 (1977); Havighurst, supra, at 377; Havighurst & Kissam, supra, at 55-68; Kallstrom, supra, at 650, 681-83. The record indicates that these harms were intended and have occurred in Arizona.
 
 
 54
 Defendants claimed that doctors were threatening to leave the Foundations if they could not increase fees. This is an admission that freedom of individual physicians to determine prices has been abolished. Similarly, third-party payors are unable to individually negotiate a lower fee. They are in a take-it-or-leave-it situation. Letters exchanged among doctors, specialty groups, and the defendants show that the fee schedules were not attempts to set a true ceiling price, but were designed to fix the fee which doctors would receive for performing a particular service. Finally, defendants have quite openly stated that their purpose is to protect fee-for-service medicine against competing forms of health care delivery. While the defendants may take steps to preserve traditional forms of business, they may not use restraints of trade to do so. It is not necessary to find predatory pricing to establish that defendants' activity had the goal of unlawfully suppressing competition.
 
 
 55
 The Foundations' plan is a cozy arrangement for both doctors and third-party payors and it diminishes their incentives to control costs. Assignment of benefits by patients covered under Foundation-approved insurance plans is apparently automatic. These claims are submitted for payment directly to the Foundations, eliminating third-party review of bills. When doctors vote to raise the level of reimbursement, insurance companies are notified in advance so that they can increase premiums to cover their higher costs. The entire system is designed to avoid providing anyone with an incentive to control costs. In addition, this system of payment appears to have been created to tie up a large percentage of doctors and third-party payors by generating high revenues for them. This would discourage them from exploring alternate, more efficient forms of health care delivery and serves to insulate physicians' incomes from any competitive pressures. The only party who does not benefit is the consumer, who must pay ever greater amounts for medical care.
 
 
 56
 In light of the total absence of real incentives for any of the plan's participants to limit fees, it is misleading to suggest that a redeeming virtue of the maximum fee schedule is cost control. A detailed economic analysis is not always necessary to understand the purpose or effect of a particular activity. Logic and common sense tell us that it is unreasonable to expect that a combination of medical providers might willingly take measures which could reduce their income and which would require changes in the way they have traditionally conducted business.[13] This is especially true when the providers are doctors, who have a long history of resisting any challenge to fee-for-service medicine. Steps to check costs will have to be initiated by informed consumers with a wider competitive choice or, more likely, from third-party payors acting on behalf of consumers.[14] These initiatives will occur only if the power of physicians is decreased in relation to these parties. Allowing doctors to set fees certainly does not improve the situation. If the fee schedule established by the defendants were abolished, it could be expected that third-party payors would be able to negotiate with each physician or health care delivery unit individually, and might be able to institute genuine attempts to control costs. Doctors would be encouraged to find methods of doing business which would lower their fees and allow them to increase their share of third-party payor business. In short, a market with more competitive features could be brought into existence.
 
 
 57
 I do not agree with the majority's belief that the relevant inquiry is whether fees are higher or lower as a result of the defendants' conduct. I am confident that the fee schedule does have the effect of raising prices, and that in its absence consumers would ultimately obtain less expensive medical care. See Kallstrom, supra, at 650. The majority's emphasis on the level of fees, however, is a version of the "reasonableness of prices" justification for price-fixing. This defense has been repeatedly rejected. National Society of Professional Engineers v. United States, supra, at 689, 98 S.Ct. at 1364; United States v. Trenton Potteries, Co., 273 U.S. 392, 397, 47 S.Ct. 377, 379, 71 L.Ed. 700 (1927). Lower prices are not the sole measuring rod of competitive conditions, nor are they necessarily the ultimate goal of the Sherman Act. That goal is the absence of restraints on market forces. See Reiter v. Sonotone Corp., 99 S.Ct. 2326, 2332 (1979) ("essence of the antitrust laws is to ensure fair price competition in an open market" (emphasis added)); National Society of Professional Engineers v. United States, supra, 435 U.S. at 692, 98 S.Ct. at 1365 (restraint illegal because it impedes the ordinary give and take of the marketplace); Goldfarb v. State Bar of Virginia, supra, 421 U.S. at 785, 95 S.Ct. at 2012 ("Nor was it necessary for petitioners to prove that the fee schedule raised fees. Petitioners clearly proved that the fee schedule fixed fees and thus 'deprive(d) purchasers or consumers of the advantages which they derive from free competition' " (cites omitted)); United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 221, 60 S.Ct. 811, 843, 84 L.Ed. 1129 (1950) ("Any combination which tampers with price structures is engaged in an unlawful activity. Even though the members of the price-fixing group were in no position to control the market, to the extent that they raised, lowered, or stabilized prices they would be directly interfering with the free play of market forces.") Congress has decided that an open market will result in public benefits, which may include lower prices. If these benefits do not result, Congress must rectify the problem, not the courts. Removal of the fee schedule here, however, clearly will be favorable to the general public.
 
 
 58
 The level or reasonableness of agreed-upon prices is also irrelevant because part of the danger in such agreements is the aggregation of competitors. Even though their initial price-tampering may seem benign, combinations of competitors possess considerable power which inevitably will be abused. See United States v. Trenton Potteries, supra. The Sherman Act requires that these consolidations of power be stopped in their infancy.
 
 
 59
 The fee schedule here presents serious competitive problems.[15] The only justification advanced on its behalf, cost control, is illusory and nonexistent. Based on an assessment of its competitive impact, this fee schedule should be subject to the per se standards traditionally applied to price-fixing.
 
 
 60
 Finally, even if the rule of reason is the correct standard by which to judge defendants' activities, a detailed economic analysis of the industry is not necessary. This agreement to fix fees is so plainly anticompetitive that it is an unreasonable restraint of trade on its face. See National Society of Professional Engineers v. United States, supra. Because no in-depth study is necessary and because it is obvious that the practice is illegal, Arizona's likelihood of success is extremely high. This contributes to the district court's error in refusing preliminary relief.
 
 
 61
 The majority counsels a cautious approach. The truly circumspect path would be to assume, until it is proven otherwise, that the per se rules, which have arisen from long experience with price tampering, are fully applicable to physician fee-setting. Because the district court used erroneous legal premises and abused its discretion in weighing the preliminary injunction factors, this Court should either grant preliminary relief to plaintiff or order the district court to reconsider its decision to deny a preliminary injunction.
 
 
 
 *
 Honorable Earl R. Larson, Senior United States District Judge for the District of Minnesota, sitting by designation
 
 
 [1]
 The case was brought under both federal and Arizona antitrust laws, but the Arizona statute is interpreted in conformity with the federal ones. Uniform State Antitrust Act, Ariz.Rev.Stat. Ann. § 44-1402
 
 
 [2]
 The Pima County Medical Society was also originally joined as a party but has been dismissed from the suit under a consent order
 
 
 [3]
 The record is silent concerning the comparison of Pima County FMC fee schedules with statewide average and median fees
 
 
 [4]
 Two Supreme Court decisions have held maximum resale price agreements to be illegal per se. Albrecht v. Herald Co., 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968); Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, 340 U.S. 211, 71 S.Ct. 259, 95 L.Ed. 219 (1951); see also Quinn v. Mobil Oil Co., 375 F.2d 273 (1st Cir.), cert. dismissed, 389 U.S. 801, 88 S.Ct. 8, 19 L.Ed.2d 56 (1967). This circuit has not extended those rulings to horizontal agreements that establish maximum prices. For an argument that the extension is proper, see L. Sullivan, Antitrust 210 (1977). A consequence of the extension, however, would be to moot an aspect of the currently lively debate concerning "limit-pricing" and predatory price-cutting. See 643 F.2d at 558-560 infra. It can hardly be said, then, that a per se rule forbidding horizontal maximum price agreements is well settled. It is arguable that this case does not present the issue for our decision. The FMC membership agreements do not set price ceilings for given services across the board but only limit the fees recoverable from certain patients, namely, those covered by FMC-approved insurance policies
 
 
 [5]
 When a questioned business practice affects more than one sphere of competition, the Rule of Reason of course recognizes that the enhancement of competition in one sphere may offset the weakening of competition in another. Sometimes, for example, "both interbrand and intrabrand competition must be considered", First Beverages, Inc. v. Royal Crown Cola Co., 612 F.2d 1164, 1170 n.8 (9th Cir. 1980), although not every case requires extensive analysis of these multiple effects or jury instructions concerning them, id. at 1170-72. Here the novelty of the market or markets and the inadequacy of the record make an inquiry into the affected areas of competition essential
 
 
 [6]
 There is no disagreement about what constitutes predatory pricing. It is "pricing at a level calculated to exclude from the market an equally or more efficient competitor," R. Posner, supra, at 188, "conduct which has the purpose and effect of advancing the actor's competitive position, not by improving the actor's market performance, but by threatening to injure or injuring (competitors), so as to drive them or keep them out of the market, or force them to compete less effectively," L. Sullivan, supra, at 108. But while this definition of predatory behavior stresses anticompetitive intent, business tactics are exceptionally resistant to state-of-mind analysis. Antitrust theorists have therefore gravitated toward purely economic definitions. For example, Areeda and Turner propose that the courts regard as predatory pricing, policies that yield returns below average or marginal cost, whichever is lowest. Areeda & Turner, supra. Since marginal and average cost include a normal return on capital, however, the difficulties of determining the normal return for the firm in question make this proposal a demanding one for the courts to implement. See L. Sullivan, supra, at 110; R. Posner, supra, at 191-93. Posner believes that a modified form of the below-cost pricing criterion is appropriate. Id. at 188-91. Although this court has entertained the possibility of proving predation by marginal or average cost statistics, Hanson v. Shell Oil Co., 541 F.2d 1352 (9th Cir. 1976), we have not held that mode of proof to be exclusive, id. at 1358 ("(Predatory pricing) could be shown by evidence" of below cost pricing (emphasis added) ); cf. Janich Bros., Inc. v. American Distilling Co., 570 F.2d 848, 858 (9th Cir. 1977), cert. denied, 439 U.S. 829, 99 S.Ct. 103, 58 L.Ed.2d 122 (1978) ("Thus, as stated in Hanson, average variable cost can be used as evidence of marginal cost."). More recently, the court has recognized "that refinement of the marginal or average variable cost test will be necessary as future cases arise." California Computer Products, Inc. v. International Business Machines Corp., 613 F.2d 727, 743 (9th Cir. 1979) (citing Williamson, supra, among other recent commentators on predatory pricing). Since there is no contention before us that predation has occurred, we note only that our skepticism about limit-pricing in no way discredits theories of predation
 
 
 [7]
 The district court reasoned that since
 "the agreements between physicians participating in the foundation-approved plans and the insurers underwriting the plans ... spread no risk peculiar to the business of insurance, the McCarran-Ferguson Act exemption does not apply to exempt the defendants' conduct from possible antitrust liability ...."
 Arizona v. Maricopa County Medical Society, No. CIV-78-800 PHX WPC (D.Ariz. June 11, 1979) (memorandum and order), Designated Record at 22-24. The parties before us have not attacked that holding. Recently, however, the Fourth Circuit decided that a chiropractors' association performing peer review and fee supervision on behalf of health insurers was within the exemption. Bartholomew v. Virginia Chiropractors Ass'n, 612 F.2d 812 (4th Cir. 1979). The Bartholomew court explained that "the procurement of drugs," with which Group Life and Health Insurance Co. v. Royal Drug Co., 440 U.S. 205, 99 S.Ct. 1067, 59 L.Ed.2d 261 (1979) dealt, was "admittedly an act only thinly tangential to ... the business of insurance," whereas the chiropractors' association played a part in insurance as "a single, composite business." Bartholomew, supra, at 817. We express no opinion regarding the validity of this distinction.
 
 
 [1]
 Although the district court's June 5, 1979, memorandum is well reasoned, it displays a misperception of the current state of antitrust analysis. The district court felt that per se rules were being supplanted by greater use of the rule of reason. A careful survey of recent decisions discloses that not only are per se rules continuing to be applied in traditional areas like price-fixing, but they are also being extended to encompass new anticompetitive practices. The Supreme Court has continually reaffirmed the value of per se rules, especially when applied to conduct affecting pricing. Maximum price-fixing clearly has been and should be regarded as per se illegal, particularly in a horizontal context. See text, infra 643 F.2d at 563. The Kallstrom article referred to by the district court takes the position that maximum price setting among individual medical providers should be per se illegal, especially when done by a Foundation for Medical Care. Kallstrom, Health Care Cost Control by Third-Party Payors, 1978 Duke L.J. 645, 680-83. Finally, the district court felt that professionals were accorded special treatment under the antitrust laws. Supreme Court and other decisions, however, indicate that when commercial practices of a profession are at issue, per se rules may be applied, particularly if the challenged activity affects price. See text, infra, 643 F.2d at 564-565. The combined effect of all these errors requires that the district court at least be ordered to reconsider its refusal to continue the preliminary injunction
 
 
 [2]
 I have concentrated on the general standards for preliminary injunctions but it should be noted that § 16 of the Sherman Act, 15 U.S.C. § 26, also governs preliminary relief under the antitrust laws. Much of the procedural difficulty here could have been avoided by closer adherence to the requirements of Rule 65 of the Federal Rules of Civil Procedure, particularly after defendants objected to the April 30 continuation of Paragraph 6
 
 
 [3]
 This continuum approach has been utilized by several circuit courts of appeals. See Chromalloy American Corp. v. Sun Chemical Corp., supra; Maryland Undercoating Co. v. Payne, 603 F.2d 477, 481 (4th Cir. 1979); Florida Medical Assoc. v. United States Dept. of Health, 601 F.2d 199, 202 (5th Cir. 1979); Jackson Dairy, Inc. v. H. P. Hood & Sons, 596 F.2d 70, 72, 74 (2d Cir. 1979); Citizens Energy Coalition of Ind. v. Sendak, 594 F.2d 1158, 1162 (7th Cir. 1979); Doe v. Colautti, 592 F.2d 704, 706 (3d Cir. 1979). One of these courts has suggested that the balance may also work in the opposite direction; the greater the movant's likelihood of success, the less the balance of harms must swing in his favor. See Maryland Undercoating Co. v. Payne, supra, at 481 n.8
 
 
 [4]
 See Staff of Perm. Subcomm. on Investigations of Senate Govern. Affairs Comm., 96th Cong., 1st Sess., California Relative Value Studies: An Overview (Staff Study 1979); Staff of Subcomm. on Oversight & Investigations of House Comm. on Interstate & Foreign Commerce, 95th Cong., 2d Sess., Conflicts of Interest on Blue Shield Boards of Directors (Comm. Print 1978); Skyrocketing Health Care Costs: The Role of Blue Shield : Hearings Before the Subcomm. on Oversight & Investigation of the House Comm. on Interstate & Foreign Commerce, 95th Cong., 2d Sess. (1978); Competition in the Health Services Market, Pts. 1-3 : Hearings Before the Subcomm. on Antitrust & Monopoly of Senate Comm. on the Judiciary, 93d Cong., 2d Sess. (1974)
 
 
 [5]
 See In the Matter of A.M.A., F.T.C. Docket No. 9064, Trade Reg. Rpts. No. 409, pt. II (CCH) (Oct. 30, 1979); Federal Trade Commission, Competition in the Health Care Sector (1978) (collection of papers from F.T.C. conference); Kanwit, FTC Enforcement Efforts Involving Trade & Professional Associations, 46 Antitrust L.J. 640 (1978); Palmer, Antitrust Activities By the FTC in the Health Field, 37 Fed.B.J. 40 (1978) (lists FTC relative value guide cases on pages 46-47)
 
 
 [6]
 See P. Proger, Antitrust in the Health Care Field (1979); M. Thompson, Antitrust & the Health Care Provider (1979); Borsody, The Antitrust Laws & the Health Industry, 12 Akron L.Rev. 417 (1979); Havighurst, Professional Restraints on Innovation in Health Care Financing, 1978 Duke L.J. 314; Havighurst & Kissam, supra ; Horan & Nord, supra ; Kallstrom, supra ; Kessel, Price Discrimination in Medicine, 1 J.L. & Econ. 20 (1958); Rosoff, Antitrust Laws & the Health Care Industry, 23 St. Louis, U.L.J. 446 (1979); Weller, supra ; Note, Application of Antitrust Laws to Anticompetitive Activities by Physicians, 30 Rutgers L.J. 991 (1977)
 
 
 [7]
 "(E)xempting provider agreements from the antitrust laws would be likely in at least some cases to have serious anticompetitive consequences. Recent studies have concluded that physicians and other health-care providers typically dominate the boards of directors of Blue Shield plans. Thus, there is little incentive on the part of Blue Shield to minimize costs, since it is in the interest of the providers to set fee schedules at the highest possible level. This domination of Blue Shield by providers is said to have resulted in rapid escalation of health-care costs to the detriment of consumers generally."
 
 
 [8]
 See Havighurst, supra, at 315-321; Havighurst & Kissam, supra, at 58, 68; Kessel, supra, at 32; Palmer, supra, at 42-3
 
 
 [9]
 The legal profession has been the recent subject of antitrust reform. The changes necessitated by adherence to the antitrust laws do not appear to have inflicted serious damage on the profession or its clients. See Weller, supra, at 101
 
 
 [10]
 See generally Enthoven, Rx for Health Care Economics, 59 Hosp.Prog. 44 (Oct. 1978); Havighurst, Controlling Health Care Costs, 1 J. Health Politics, Policy & Law 471 (1977); Havighurst & Hackbarth, Private Cost Containment, 300 N.Eng.J. of Med. 1298 (1979); McClure, On Broadening the Definition of and Removing Regulatory Barriers to a Competitive Health Care System, 3 J. of Health Politics, Policy & Law 303 (1978)
 
 
 [11]
 In Broadcast Music the Supreme Court's major concern was the danger of too-quick characterization of conduct as price-fixing. Placing activity in the per se illegal price-fixing category essentially forecloses the issue of liability against the defendant. Therefore, care must be taken to ascertain that the conduct is indeed a traditional form of price-fixing, or a variant displaying similar anticompetitive aspects. The Court felt that defendant's behavior in Broadcast Music was not traditional price-fixing. 441 U.S. at 23, 99 S.Ct. at 1564 ("the blanket license cannot be wholly equated with a simple horizontal arrangement among competitors"). Defendant was already subject to antitrust decrees, id. at 10-16, 99 S.Ct. at 1557-1560, and was seen as performing a middleman function, id. at 19-23, 99 S.Ct. at 1562-1564. See Comment, 91 Harv.L.Rev. 488 (1977) (author's analysis apparently followed by Supreme Court)
 Here we are examining conduct which is a customary form of price-fixing between competitors, 441 U.S. at 8, 99 S.Ct. at 1556 ("(A)greements among competitors to fix prices on their individual goods or services are among those concerted activities that the Court has held to be within the per se category."), and the deficiencies of "analysis by characterization" are not a problem. In my view, the fact that defendants' activity is conventional price-fixing makes this second area of inquiry unnecessary in this case. What is different here is not the challenged practice itself, but the industry in which it occurs. As I stated above at 556-558, that difference should not require abandonment of the per se rules.
 
 
 [12]
 Civil liability under the Sherman Act may be predicated on a finding of either an unlawful purpose or an anticompetitive effect. McLain v. Real Estate Board of New Orleans, Inc., 444 U.S 232, 100 S.Ct. 502, 509, 62 L.Ed.2d 441 (1980); United States v. United States Gypsum Co., 438 U.S. 422, 436 n.13, 98 S.Ct. 2864, 2873 n.13, 57 L.Ed.2d 854 (1978). Defendants' purpose here was to fix prices and to suppress competition. These are per se unlawful purposes. It may not be necessary to assess the actual competitive effects of the controverted behavior where the unlawful purpose is clear
 
 
 [13]
 See Havighurst & Kissam, supra, at 68
 
 
 [14]
 See Havighurst, Controlling Health Care Costs, supra, at 485
 
 
 [15]
 The fee schedule also poses potential anticompetitive problems as a price information exchange. The schedule was widely disseminated and could be used by doctors who were not Foundation members and could be used to bill clients not covered by the third-party payors. In this way the schedule would have an even greater impact on prices. This price information sharing relates to the level of price and does not seem to have a market-perfecting function. As such it is particularly dangerous. See United States v. United States Gypsum Co., supra, 438 U.S. at 441 n.16, 98 S.Ct. at 2875 n.16; L. Sullivan, supra, at §§ 93-96; Posner, Information & Antitrust, 67 Geo.L.J. 1187 (1979)