**CITY OF ANAHEIM, CALIFORNIA, City of Riverside, California, City of Banning, California, Plaintiffs-Appellants,**

v.

**Thomas E. KLEPPE, Individually and as Secretary of the Interior, Gilbert Stamm, Individually and as Commissioner of the Bureau of Reclamation, Department of the Interior, Washington, D. C., Arizona Public Service Company, Tucson Gas and Electric Company, Nevada Power Company and Southern California Edison Company, Defendants-Appellees.**

No. 77–2431.

United States Court of Appeals, Ninth Circuit.

Dec. 13, 1978.

Rehearing and Rehearing En Banc Denied Feb. 20, 1979.

Robert L. Klarquist, Atty., Washington, D. C., for defendants-appellees.

Daniel I. Davidson, Washington, D. C., and Daniel J. McAuliffe, Phoenix, Ariz., for plaintiffs-appellants.

OPINION

Before MERRILL and CHOY, Circuit Judges, and TANNER *, District Judge.

CHOY, Circuit Judge:

The cities of Anaheim, Riverside, and Banning, California, (the Cities) appeal from the district court's denial of their prayer for a preliminary injunction. We affirm.

On June 14, 1968, the Secretary of the Interior informed a meeting of various utilities considering the development of a thermal generating plant in the Four Corners region of the Southwest that the United States might be interested in acquiring an entitlement to the power generated by any new facilities as part of the then proposed Central Arizona Project (CAP). As a consequence, the Navajo-Four Corners Project Steering Committee (Steering Committee) was formed. The Steering Committee approached various public and private bodies to determine the possible interest of other utilities in the Navajo project. Having been invited, the city of Anaheim joined the Steering Committee as a study participant and attended committee meetings commencing on May 6, 1969.

The Colorado Basin Project Act, 43 U.S.C. § 1501 et seq., was signed into law on September 30, 1968. Among other things, the Act authorized the Secretary of the Interior to develop the CAP to furnish irrigation and municipal water for water-deficient areas of Arizona and western New Mexico. See 43 U.S.C. §§ 1521–1528. Congress provided that the Secretary could sell federal power supplies acquired for the CAP when not needed for CAP purposes. See 43 U.S.C. § 1523(b). Congress also provided that in selling excess power, preference should be given to certain purchasers:

* The Honorable Jack E. Tanner, United States District Judge for the Western District of Washington, sitting by designation.

[P]reference shall be given to municipalities and other public corporations and agencies; and also to cooperatives and other nonprofit organizations financed in whole or in part by loans made pursuant to the Rural Electrification Act . . . . 43 U.S.C. § 485h(c).[1] The Secretary was required to submit his recommended plan for development of the CAP to Congress no later than September 30, 1969. 43 U.S.C. § 1523(c). However, it was not until June 20, 1969, that the Steering Committee reached the decision to construct the Navajo project.

To fulfill CAP goals, the Secretary entered into an agreement with the various utilities involved in the Navajo project whereby the Bureau of Reclamation would obtain 561 megawatts of the Navajo plant's power output. The Navajo plant, however, was scheduled to begin operations around 1974 while the Bureau would not need the power for CAP purposes until nearly 1980. Because the Government would become obligated to utilize or dispose of the federal share of the Navajo plant's output before the CAP could use the power, Bureau representatives insisted that the Government would not make a commitment to participate in the Navajo plant unless it obtained firm commitments for purchase of the "interim" power. The Bureau was particularly concerned about promptly securing firm commitments because the Secretary had to report to Congress within three months that he had obtained the commitments. If he could not, the federal Government would have to end its participation in the Navajo project, causing the project to abort. On August 22, 1969, the Secretary contracted for interim disposition of the Government's entitlement with both preferred and nonpreferred customers. The Secretary's plan to participate in the Navajo project was subsequently approved by Congress.[2]

Although a representative of Anaheim was present at the August 15, 1969, Steering Committee meeting at which final interim power allocations were made, neither Anaheim nor any other of the Cities made an offer to purchase power. The Cities acknowledge that they lacked arrangements for adequate transmission facilities in 1969. In 1972, however, the Cities obtained the necessary facilities and made a formal offer to purchase federal power. The Secretary has continued to sell the power to the contract purchasers and has made none of it available to the Cities.

The Cities filed suit claiming that the Secretary wrongfully failed to make an offer to the Cities subject to their later acquiring adequate transmission facilities within a reasonable time. They also claimed that the Secretary exceeded his authority by executing with nonpreferred customers contracts that lacked provisions allowing the Government to deal with preferred customers who later became able to take interim power.[3] Claiming irreparable harm in the form of additional expense for power, the Cities sought a preliminary injunction ordering the Secretary to sell to the Cities power being sold to nonpreferred customers.

■ The district court refused to issue a preliminary injunction, finding "that the plaintiffs have failed to establish the substantial likelihood of prevailing on the merits necessary to support preliminary relief." The Cities renew here their claim that they will clearly prevail because of two decisions of this court and an opinion by the Attorney General in 1955: *Santa Clara v. Andrus,* 572 F.2d 660 (9th Cir.), *cert. denied,* —— U.S. ——, 99 S.Ct. 177, 58 L.Ed.2d 167 (1978); *Arizona Power Pooling Ass'n v. Morton,* 527 F.2d 721 (9th Cir. 1975), *cert. denied,* 425 U.S. 911, 96 S.Ct. 1506, 47 L.Ed.2d 761 (1976); Disposition of Surplus

---

1. Section 485h(c) is part of the Federal Reclamation Act of 1939. Section 604 of the Colorado River Project Act, 43 U.S.C. § 1554, incorporates § 485h(c) by reference.

2. For a detailed account of the history of the Navajo project, see *Arizona Power Pooling Ass'n v. Morton,* 527 F.2d 721, 723–24 (9th Cir.

1975), *cert. denied,* 425 U.S. 911, 96 S.Ct. 1506, 47 L.Ed.2d 761 (1976).

3. The interim power contracts provide that the power may not be withdrawn even by the United States until 1980.

Power Generated at Clark Hill Reservoir Project, 41 Op.Att'y Gen. 236 (1955) [hereafter cited as *Clark Hill*].[4]

We believe that those three opinions are inapposite. Each dealt with a situation in which the Secretary had before him offers to buy power from both preferred and nonpreferred purchasers and awarded the power to the nonpreferred. In the present case the Cities acknowledge that they made no such offer at the time of awarding of the interim power in 1969.

*Santa Clara* held that the sale of government power to a private utility violated the preference provision even though the sale agreement contained a provision allowing the Government to repurchase the power if later needed for preferred customers.[5] The

---

**4.** The district court's failure to grant a preliminary injunction may be appealed to this court under 28 U.S.C. § 1292(a)(1). The district court will be reversed only if it abused its discretion or based its decision upon an erroneous legal standard or clearly erroneous finding of fact. *Shinto Shipping Co. v. Fibrex & Shipping Co.*, 572 F.2d 1328, 1331 (9th Cir. 1978); *Aquirre v. Chula Vista Sanitary Serv.*, 542 F.2d 779, 780–81 (9th Cir. 1976).

In *Sierra Club v. Hathaway*, 579 F.2d 1162, 1167 (9th Cir. 1978), this court reiterated the traditional formula for determining the propriety of preliminary relief:

(1) have the movants established a strong likelihood of success on the merits; (2) does the balance of irreparable harm favor the movants; (3) does the public interest favor granting the injunction?

(Citations & footnote omitted.) *See Barrett v. Smith*, 530 F.2d 829, 830, 833 (9th Cir. 1975), *cert. denied*, 425 U.S. 977, 96 S.Ct. 2179, 48 L.Ed.2d 801 (1976); *King v. Saddleback Jr. College Dist.*, 425 F.2d 426, 427 (9th Cir. 1970), *cert. denied*, 404 U.S. 979, 92 S.Ct. 342, 30 L.Ed.2d 294 (1971).

*Sierra Club* noted that an earlier decision of this court had adopted an alternative test requiring the movants to show "either a combination of probable success and the possibility of irreparable injury or that serious questions are raised and the balance of hardships tips sharply in [their] favor." 579 F.2d at 1167 n. 7, *quoting Wm. Inglis & Sons Baking Co. v. ITT Continental Baking Co.*, 526 F.2d 86, 88 (9th Cir. 1975). We subsequently interpreted the effect of the *Inglis* decision as requiring the issuance of a preliminary injunction "upon a clear showing of either (1) probable success on the merits *and* possible irreparable injury, *or* (2) sufficiently serious questions going to the merits to make them a fair ground for litigation *and* a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Aguirre*, 542 F.2d at 781, *quoting Gresham v. Chambers*, 501 F.2d 687, 691 (2d Cir. 1974).

Recently this court commented on the two alternatives set forth by *Inglis:*

[T]here are not really two entirely separate tests, but . . . merely extremes of a single continuum. *Fox Valley Harvestore v. A. O. Harvestore Products, Inc.*, 545 F.2d

1096 (7th Cir. 1976). The critical element in determining the test to be applied is the relative hardship of the parties. If the balance of harm tips decidedly toward the plaintiff, then the plaintiff need not show as robust a likelihood of success on the merits as when the balance tips less decidedly. *Aguirre* . . . . No chance of success at all, however, will not suffice. The irreducible minimum has been described by one court as a fair chance of success on the merits, *McCormick v. Claytor*, 441 F.Supp. 622 (D. Oregon 1977), while another has said the questions must be serious enough to require litigation, *Aguirre, supra.* The difference between the two formulations is insignificant. Therefore, we accept either as satisfactory.

*Benda v. Grand Lodge of Int'l. Ass'n*, 584 F.2d 308, 315 (9th Cir. 1978). *Benda* thus establishes that the necessary showing of likelihood of success on the merits decreases as the balance of hardships increases in favor of the movant. As the Seventh Circuit said in *A. O. Smith*, the alternate test posed in *Inglis* means "not that ultimate success is no longer a factor, but that if the harm to the [movant] is sufficiently serious, the factor of likelihood of success on the merits diminishes in importance in the equitable balancing process." 545 F.2d at 1098.

The Cities argued to the district court that the equities and the balance of harm required issuance of a preliminary injunction. Having heard testimony pertaining to those matters, the district court concluded that the Cities' showing of likely success on the merits was insufficient to warrant a preliminary injunction. Whether we employ the traditional criteria enunciated in *Sierra Club* or the *Benda* sliding scale, the showing of likely success on the merits is not sufficiently robust for us to conclude that the district court abused its discretion in refusing to issue a preliminary injunction.

**5.** Section 485h(c) also prohibits the Secretary from entering into contracts that will "impair the efficiency of the project for irrigation purposes." The *Santa Clara* court remanded to the district court to allow, *inter alia*, the Secretary to raise the claim that a contract with Santa Clara would have contravened this provision.

City of Santa Clara first requested Government power in 1960. It began receiving Government power in 1965. Beginning in 1971, the Government reduced the amount of power sold to Santa Clara in order to augment the amount sold to other preferred customers. At the same time the Secretary sold power to a nonpreferred utility from which Santa Clara purchased the balance of its needs at a price higher than that charged by the Government. Referring to *Arizona Power* and *Clark Hill,* we wrote:

> It is only if the available supply exceeds the demands of interested preference customers that the Secretary may offer federal power to private entities. [*Clark Hill.*]
>
> In this case the Secretary has marketed . . . power to . . . a non-preference entity, during times when a preference customer was having its allotment gradually reduced, over its objection.

572 F.2d at 670 (footnote omitted).

In *Arizona Power* it was "undisputed that the Secretary refused to offer [certain preference customers] the opportunity to become a purchaser, and contracted instead with [other preference and nonpreference customers]." 527 F.2d at 724. Noting "the stated congressional objective of offering the government's excess power allotment to public entities first," *id.* at 727, we held that the Secretary had violated the preference provisions:

> It is not the ultimate sale of the interim power to [nonpreference customers] which is alleged to be a violation of the preference clause, but rather the undisputed refusal of the federal appellees to offer appellant the opportunity to purchase the power prior to offering it to the private utility companies . . . .

[T]he potential preference customers had sought, and had been refused, the chance to participate in the purchase of the government's entitlement to interim thermal power . . . .

*Id.* at 726. On rehearing the court reiterated: "It is clear that under the terms of the preference clause neither the plaintiffs nor any other preference customer has an automatic entitlement to the excess power . . . . [But plaintiffs allege] that as preference customers they have had no opportunity to compete for this surplus power. *Id.* at 730.

*Clark Hill* also dealt with competing offers to buy.[6] The Attorney General wrote:

> [W]hen the Secretary . . . has before him two competing offers to purchase power, one by a preference customer and the other by a nonpreference customer, and the former does not have at the time the physical means to take and distribute the power, he must contract with the preference customer on condition that such customer will, within a reasonable time . . . obtain the means for taking and delivering the power.

41 Op.Att'y Gen. at 243–44.

In the instant case the Cities did not offer to buy federal power until approximately three years after the Government had contracted to sell the interim power, even though one of the Cities sat on the committee soliciting offers and therefore was aware of the impending sale. Because there were no "competing offers to purchaser power" from a preferred customer and nonpreferred customer, the three cases relied upon by the Cities are not directly applicable or compelling.[7] Since the three

---

6. *Santa Clara* noted that the *Clark Hill* opinion interpreted a preference provision of the Flood Control Act of 1944 "almost identical to that contained in the Reclamation Project Act of 1939." 572 F.2d at 670 n. 6. As noted *supra* note 1, the Reclamation Act preference provision is incorporated into the Colorado River Project Act.

7. The importance of the existence of competing offers is underscored by the Attorney General's

distinguishing of an earlier opinion on that basis. In *Clark Hill* the Attorney General wrote:

> Nor do I regard my position as in conflict with that taken by Acting Attorney General Fowler in 1913 in connection with section 5 of the act of April 16, 1906 . . . which authorized the Secretary of the Interior "to lease" surplus power "giving preference to municipal purposes." [Citation omitted.] There, it was held that the Secretary was

opinions on which the Cities rely do not "establish a strong likelihood of success on the merits," the district court did not abuse its discretion in refusing to issue preliminary relief. We express no opinion as to the final resolution of the Cities' contentions.

AFFIRMED.

authorized to lease such power to a private company; *but it does not appear, as here, that the Secretary was faced with choosing* *between conflicting offers made by a preference user and a nonpreference user.*
41 Op.Att'y Gen. at 250–51 (emphasis added).