**CITY OF ANAHEIM, CALIFORNIA, City of Riverside, California, and City of Banning, California, Plaintiffs-Appellants,**

v.

**Charles W. DUNCAN,\* individually and as Secretary of Energy, et al., Defendants-Appellees.**

**No. 79–3803.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted June 9, 1981.

Decided Oct. 13, 1981.

---

\* During the pendency of this litigation, the Secretary of Energy succeeded the Secretary of Interior as the official responsible for the subject matter of the litigation. (*See* Fed.R.App.P. 43(c).)

Daniel I. Davidson, Washington, D. C., for plaintiffs-appellants.

Robert L. Klarquist, Washington, D. C., Daniel J. McAuliffe, Phoenix, Ariz., argued for defendants-appellees; Richard S. Allemann, Asst. U. S. Atty., Snell & Wilmer, Phoenix, Ariz., on brief.

Before GOODWIN, SKOPIL and REINHARDT, Circuit Judges.

GOODWIN, Circuit Judge.

The cities of Anaheim, Banning and Riverside appeal from the summary judgment entered in favor of the appellees, various government officials and agencies and several private utility companies (hereinafter "the utilities"). This is the fourth appeal arising out of the Navajo thermal-generation power plant in Page, Arizona.[1] The Navajo plant eventually will supply power

---

1. The cases include: *City of Anaheim v. Kleppe*, 590 F.2d 285 (9th Cir. 1978) (denial of a preliminary injunction to appellants in the instant case); *City of Santa Clara, Cal. v. Andrus*, 572 F.2d 660 (9th Cir), *cert. denied*, 439 U.S. 859, 99 S.Ct. 176, 58 L.Ed.2d 167 (1978) (holding unreviewable the Secretary's allocation of power between preference entities and holding that "banking" of power with a private utility for later sale to preference entities was in fact a sale, and thus violated the preference clause because it occurred when a preference entity's power was being withdrawn); and *Arizona Power Pooling Association v. Morton*, 527 F.2d 721 (9th Cir. 1975), *cert. denied*, 425 U.S. 911, 96 S.Ct. 1506, 47 L.Ed.2d 761 (1976) (holding the preference clause applicable to the sale of thermal-generated power; holding that Congress had not waived the application of the preference clause to the Central Arizona Project; and holding that the sale of power was reviewable under the Administrative Procedure Act. The case was reversed and remanded to determine whether the preference clause was violated and whether any such violation was excused).

to the United States for the Central Arizona Project ("CAP"). *See Arizona Power Pooling Association v. Morton*, 527 F.2d 721 (9th Cir. 1975), *cert. denied*, 425 U.S. 911, 96 S.Ct. 1506, 47 L.Ed.2d 761 (1976), for an exhaustive discussion of these projects. The facts of this case are set forth at length in *City of Anaheim v. Kleppe*, 590 F.2d 285 (9th Cir. 1978) (*Anaheim I* affirmed the district court's denial of a preliminary injunction).[2]

In 1968 the United States first considered participating in the Navajo thermal-generation power plant in order to have power available for CAP. The Navajo plant was expected to become operational in 1974. The United States did not expect to be able to use the power until 1980. Thus, before it would commit itself to the Navajo project, the United States sought firm commitments from other users to buy the "interim power" (*i.e.*, the power generated from 1974 to 1980). For various reasons, the United States had only three months to find such purchasers.[3] During this period Anaheim was aware that the United States was seeking to sell the "interim power,"[4] but Banning and Riverside were not. At this time none of the cities had the transmission capacity to accept the interim power. After some difficulty the United States obtained firm commitments from the private utility companies to buy the interim power.[5]

In 1972 Anaheim developed the ability to receive power from the Navajo plant.[6] It offered to buy the interim power. The United States refused because it had already contracted to sell the power to the utilities. The cities sued. The district court granted summary judgment in favor of the utilities and the government.

The cities make three different arguments, but all are based on the "preference clause" of the Federal Reclamation Act of 1939.[7] The preference clause applies to the

**2.** We have not departed from the general rule that a decision on a preliminary injunction does not constitute the law of the case and the parties are free to litigate the merits. *See Ross-Whitney Corp. v. Smith Kline & French Lab.*, 207 F.2d 190, 194 (9th Cir. 1953); 7 Moore's Federal Practice, ¶ 65.21 at 65–157; and 11 Wright & Miller, *Federal Practice and Procedure*, § 2962 at 630–31.

The parties presented additional, albeit somewhat cumulative, evidence on their motion for summary judgment. They are entitled to a hearing on the merits.

**3.** In mid-1968 the Navajo-Four Corners Project Steering Committee was formed to study the feasibility of a six-unit project. Ten entities were represented on the committee. In January 1969 the committee issued an interim report which concluded that the project was feasible. The committee had focused on a two-site project. Letters of invitations were sent to various preference entities in March 1969. (Anaheim responded and was placed on the committee in May 1969.) By May 1969, however, four of the initial ten entities had withdrawn. As a result, the project was restructured. It was only in mid-June 1969 that a decision was made to proceed with three units at one location only. By September 30, 1969, however, the Secretary had to report to Congress. Thus, he had only three months to secure commitments for the interim power.

**4.** The record shows that Anaheim was present at steering committee meetings where the need to sell the interim power was discussed.

**5.** The final commitments were not received until the final steering committee meeting in August 1969.

**6.** The cities obtained the capacity to receive power by virtue of a settlement agreement they signed with Southern California Edison Company in August 1972.

**7.** The preference clause of the Federal Reclamation Act of 1939, 43 U.S.C. § 485h(c), provides:

"*Provided further*, That in said sales or leases [of electric power] preference shall be given to municipalities and other public corporations or agencies; and also to cooperatives and other nonprofit organizations financed in whole or in part by loans made pursuant to the Rural Electrification Act of 1936. Nothing in this subsection shall be applicable to provisions in existing contracts, made pursuant to law, for the use of power and miscellaneous revenues of a project for the benefit of users of water from such project. The provisions of this subsection respecting the terms of sales of electric power and leases of power privileges shall be in addition and alternative to any authority in existing laws relating to particular projects. No contract relating to municipal water supply or miscellaneous purposes or to electric power or power privileges shall be made unless, in the judgment of the Secretary, it will not impair the efficiency of the project for irrigation purposes."

interim power generated at the Navajo plant, see *Arizona Power Pooling Association v. Morton, supra,* 527 F.2d at 725, and requires that preference in sales be given to certain entities, including municipalities. All of the appellants are preference entities, none of the utilities are.

The cities' first argument is that the United States' obligation to contract with preference entities is triggered by an affirmative expression of interest, which need not amount to a formal offer. They argue that Anaheim made a sufficient expression of interest. The cities next argue that the sale of power to nonpreference entities was illegal because Banning and Riverside (preference entities) were not notified of the intended sale. They also argue that the contracts with the private utilities should have contained a "withdrawability" provision allowing the United States to withdraw power from nonpreference entities in order to supply preference customers.

We begin with the first argument. The body of law relative to the preference clause is limited. It consists of three other Navajo plant cases, see n.1, *supra,* and an Attorney General Opinion construing a similar preference clause.[8]  41 Op.Att'y.Gen. 236 (1955) (the *"Clark Hill"* opinion). The cities rely heavily on the following language from the *Clark Hill* opinion:

> "[I]f there are two competing offers to purchase such power, one by a preference customer and the other by a non-preference customer, and the former does not have at the time the physical means to take and distribute the power, the Secretary of the Interior must contract with the preference customer on condition that

within a reasonable time to be fixed by him, it will obtain the means for taking and distributing the power." *Id.*

The cities argue that this means that the government had the duty not to contract with nonpreference entities once a preference entity indicated that if the transmission means were available it would buy the power. The cities argue that any other construction would render *Clark Hill* meaningless because they could not make an offer until they knew that they could accept the power.

· We need not decide what constitutes an "offer" or the degree of interest required to trigger the preference clause. This case is much simpler. It is undisputed that the Secretary of the Interior had to advise Congress by September 30, 1969, whether to proceed with the Navajo plant.[9]  It is also undisputed that the Secretary would have advised participating only if the United States had firm commitments to buy the interim power. Thus, it is clear that in this case if a contract to sell the power were to be made, the commitments to buy the power would have to be made before September 30, 1969. The cities do not argue that they offered to buy the power in 1969. They do not even argue that they made a conditional offer to buy the power at some future time. Nor do they argue that there was any possibility in 1969 that they would offer to buy the power.[10]  The United States did not refuse to contract with anyone; in fact, it was aggressively looking for a buyer.

In essence the cities ask us to hold that the United States must refrain from contracting with a nonpreference entity if a

---

**8.** The *Clark Hill* opinion, 41 Op.Att'y.Gen. 236 (1955), interpreted a preference provision of the Flood Control Act of 1944. That provision is almost identical to that contained in the Reclamation Project Act of 1939, which is applicable here. *Anaheim I, supra,* n.1, 590 F.2d at 289, n.6; *Santa Clara, supra,* n.1, 572 F.2d at 670, n.6.

**9.** See 43 U.S.C. § 1523(c); *Anaheim I, supra,* n.1, 590 F.2d at 287.

**10.** Anaheim relies in chief on an August 13, 1969, letter to show its "expression of interest." A copy of the letter was sent to the

Bureau of Reclamation. Anaheim's follow-up letter of August 27, 1969, summarized its position as follows:

> "I would like to comment that we are even now unable to indicate to the Steering Committee of the Navajo Project a serious intent to purchase Bureau lay-off power since we have no means of transporting this power to Anaheim. . . . We finally came to the point in our studies which resulted in asking the Edison Company for terms and conditions for providing this transmission service."

preference entity might be willing at some future date, several years away, to contract for the same power. The cities ignore the reality that the government was not in a position to wait. The government had to contract immediately or forget the project. The preference clause does not require an absurd result.

The legislative history shows exactly what was intended by Congress. There was extensive debate over the preference clause. 84 Cong.Rec. 10219–26 (1939). The original house bill (H.R. 6984) contained a preference clause similar to the one that was enacted. The House Committee struck the preference provisions. The Senate proposed an amendment which inserted the existing preference clause into the bill. With one dissenting vote, the joint conference committee on the bill endorsed the amendment. *See* S.Rep. 758, 76th Cong., 1st Sess. 3 (1939); H.R.Rep. 1252, 76th Cong., 1st Sess. 2 (1939).

The thrust of the debate over the preference clause was whether the amendment improperly "brought the power question into an irrigation and reclamation project." *Id.* at 10222 (remarks of Representative Winter). One opponent of the preference clause argued that "the effect of the Senate's amendment is to change the emphasis in this bill from reclamation and water conservation to power promotion." *Id.* at 10223 (remarks of Representative Case).

The proponents of the amendment argued that the opponents were making "a mountain out of a mole hill." *Id.* at 10223 (remarks of Representative Murdock). They stated that the amendment merely codified existing practice. *Id.* at 10221 (remarks of Representative Connor). Proponents met the attacks on the amendment by stating that it did not give preference to power over reclamation. *See, e. g., id.* 10220 (remarks of Representative White). Moreover, the proponents of the preference clause saw it as a means to further reclamation and water conservation purposes. *Id.* at 10223 (remarks of Representative Murdock).

In this case, the interpretation urged by the municipalities conflicts with the legislative intent. Their interpretation would have impeded, if not indeed cancelled, the government's involvement, and the Navajo project. The preference clause was not meant to interfere with the primary purpose of the act—water conservation and reclamation. Thus, we conclude that the legislative history does not support the result urged by the municipalities. *Accord,* 30 Op.Att'y.Gen. 197 (1912) (stating that the Secretary was free to contract with a nonpreference user under the 1906 act if that contract would be more profitable. The reason was phrased: "If the lease for municipal uses promised less advantage, [the Secretary] could not make it without favoring the mere incident of the statute to the detriment of its prime object").

■ Thus, we hold that given the facts of this case and the unique time pressure under which the United States was operating, the government did not violate the preference clause when it contracted in 1969 to sell the interim power to the utilities.

We now turn to the third argument made by the cities. They argue that the contract with the utilities should have contained a "withdrawability" clause. They cite the following language from the *Clark Hill* opinion:

"If . . . the preference customer does not [contract with the United States] . . . the Secretary is then authorized to contract with the non-preference customer, subject to the condition that should the preference customer subsequently obtain the means to take and distribute the power, the Secretary will be enabled to deal with the preference customer." 41 Op.Att'y. Gen. at 236.

We need not and do not decide whether, in the normal case, a withdrawal and renegotiation clause is required. Even assuming that *Clark Hill* is correct and that such a clause is normally required, we hold that this case has special facts which make it inappropriate to require a withdrawal clause.

■ The contract in issue was of a fixed and short duration (its expected life was six years). The contract did not apply to the typical situation envisioned by the drafters of the preference clause. Normally, government-generated energy is readily marketable because it sells at a favorable price. The preference clause was enacted so that municipalities and other public entities would receive first call on the low-cost power.[11]

■ In this case, it was a "buyer's market" rather than a "seller's market." The interim power was not particularly desirable for a variety of reasons.[12] The government needed to sell the power immediately. There is evidence suggesting that it may have had greater difficulty in selling the power if the contracts contained a withdrawal provision.[13] Thus, we conclude that even if the preference clause is later interpreted to require a withdrawal provision (a question we expressly reserve), no such clause is required here. This situation is sufficiently unique to convince us that Congress did not intend the preference clause to demand a withdrawal clause in this instance.

Riverside and Banning have also argued that the interim power contracts are illegal because the Secretary failed to give them notice of the upcoming sale. They argue that such notice is required to enable them to make a *Clark Hill* offer. We reject this argument.

■ The cities have pointed to no provision in the preference clause or elsewhere that requires notice. Nothing specifies who should be notified—e. g., all preference entities, or only preference entities within a certain distance, or only preference entities possessing transmission facilities. Thus, in light of these circumstances we can only conclude that even if notice is required under the preference clause (a question we need not decide), all that could be required is reasonable notice, as determined on a case-by-case basis.

■ In this case we are satisfied that reasonable notice did not include notice to Banning and Riverside. It is undisputed that those two cities did not have the transmission ability which would have enabled them within a reasonable time to contract for the interim power.[14] Moreover, in the circumstances of this case, the government did not violate the preference clause by choosing among the available parties those who could make a firm commitment in 1969, or by signing contracts that did not contain withdrawal provisions. Therefore,

**11.** *Cf.* 41 Op.Att'y.Gen. 236, 247–49 (discussing the reasons underlying an "almost identical," *see* n.8, *supra*, preference clause).

**12.** As described by a Regional Supervisor of the U.S. Bureau of Reclamation, and steering committee member,:

"Navajo power would be contingent upon the operation of the units and would not be firm power. Purchasers would be required to have available to them spinning reserves that would permit them to satisfy their load obligations independently during outages of the Navajo units. USBR did not have uncommitted hydro-electric resources to provide such reserves. After CAP operation begins, USBR would be required to drop CAP pumps upon outages of Navajo units. Interim power purchasers would have to be able to provide transmission facilities that interconnected with the Navajo transmission system and permitted them to accept the interim power at established Navajo Project delivery points. . . ."

*See* n. 5, *supra.*

**13.** Russell L. Mitchell, of Southern California Edison, testified that if the power had been offered to Edison on a withdrawable basis, Edison would probably have tried to make other arrangements for power. *But see* the testimony of Whitfield A. Russell, the cities' expert witness. He testified as to why, in his judgment, Edison would have accepted a conditional contract with government.

**14.** Moreover, the United States was fully cognizant of the cities' lack of transmission power. The Assistant Commissioner of the U.S. Bureau of Reclamation (USBR), and USBR's representative on the steering committee stated that as a result of recent projects, he or his staff were "intimately familiar with the resources, needs and loads of the preference customer." He also stated that efforts were made to keep preference customers informed, through formal and informal contacts, despite an awareness that few if any preference customers were in a position to make a firm commitment in 1969 for the interim power.

even assuming that the preference clause required the government to provide reasonable notice, the failure to notify Banning and Riverside neither constitutes a breach of that duty, nor invalidates the contract with the utilities.

Accordingly, the judgment is affirmed.