The UTILITY REFORM
PROJECT, Petitioner,

v.

BONNEVILLE POWER ADMINISTRA-
TION and Peter Johnson,
Administrator, Respondent,

Washington Water Power Company,
Respondent/Intervenor.

PUBLIC UTILITY DISTRICT NO. 1 OF
CLARK COUNTY, a Washington
municipal corporation, Petitioners,

v.

BONNEVILLE POWER ADMINISTRA-
TION; Peter J. Johnson, Administrator
of Bonneville Power Administration;
Puget Sound Power & Light Company,
a Washington corporation; Washing-
ton Water Power Company, a Washing-
ton corporation; Portland General
Electric Company, An Oregon corpora-
tion, et al., Respondents.

CITY OF BONNERS FERRY, IDAHO;
City of Burley, Idaho; City of Centra-
lia, Washington; Clearwater Power Co.,
Idaho; City of Declo, Idaho; East and
Mutual Electric Co., Idaho, et al., Peti-
tioners,

v.

BONNEVILLE POWER ADMINISTRA-
TION; Peter T. Johnson, Administrator
of Bonneville Power Administration;
Puget Sound Power & Light Company;
Pacific Power & Light Company; Port-
land General Electric Co., et al., Re-
spondents.

COLUMBIA RURAL ELECTRIC ASSO-
CIATION, INC., Blachly–Lane County
Cooperative Electric Association, Co-
lumbia Basin Electric Cooperative,
Inc., et al., Petitioners,

v.

BONNEVILLE POWER ADMINISTRA-
TION; Peter T. Johnson, Administrator
of the Bonneville Power Administra-
tion; Puget Sound Power & Light Co.;
Washington Power Co.; Portland Gen-
eral Electric Co.; Pacific Power &
Light Co.; and Washington Public
Power Supply System, Respondents.

Nos. 85–7678, 85–7699, 85–7701
and 85–7702.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted March 9, 1988.
Decided Jan. 27, 1989.
As Modified June 7, 1989.

438

John D. Lowery, Seattle, Wash., for Small Utilities Group.

Andrew J. Kinstler, Seattle, Wash., for Certain Columbia Cooperatives.

Douglas N. Ragen, Portland, Or., for Washington Group.

Harry E. Grant, Seattle, Wash., for City of Bonners Ferry and Small Utilities Group.

Robert B. Ross, Asst. U.S. Atty., Portland, Or., William N. Mathias, Seattle, Wash., for Washington Public Power Supply System.

Stoel, Rives, Boley, Jones & Grey, Stephen S. Walters, Alan R. Merkle, Portland, Or., for Pacific Power & Light Co.

Perkins Coie, David E. Wagoner, Donald G. Kari, Eugene C. Chellis, Seattle, Wash., for Puget Sound Power & Light Co.

Paine, Hamblen, Coffin, Brooke & Miller, Gary A. Dahlke, Robert E. Neate, Spokane, Wash., for The Washington Water Power Co.

Tonkon, Torp, Galen, Marmaduke & Booth, William F. Martson, Barbee Lyon, Portland, Or., for Portland General Elec. Co.

Before TANG and CANBY, Jr., Circuit Judges, and CURTIS,* District Judge.

CANBY, Circuit Judge:

*Introduction*

This is an original proceeding brought under the Pacific Northwest Electric Power Planning and Conservation Act ("the Regional Act"), 16 U.S.C. § 839f(e)(5). The petition challenges the legality of a settlement agreement entered by the Bonneville

---

* The Honorable Jesse W. Curtis, Senior U.S. District Judge for the Central District of California, sitting by designation.

Power Administration ("BPA") to settle claims brought by four Investor–Owned Utilities ("IOUs") as a result of BPA's decision to cease construction of a partially-completed Federal nuclear power plant. For reasons we will set forth, we conclude that BPA's settlement was lawful.

The petitioners are: a group of rural electric cooperatives in Washington, Oregon, Idaho and California ("Coops"); the city of Bonners Ferry and 26 other small municipal and rural electric cooperatives known as the Small Utilities Group ("SUG"); and a group of Public Utility Districts from the State of Washington ("Washington Group")[1]. The primary respondent is BPA.[2] Certain investor-owned utilities ("IOUs") have also intervened as respondents. Pursuant to a motion by the IOUs, all affirmative claims against the IOUs are dismissed;[3] the IOUs remain in the case only as intervenors defending BPA's action. The Washington Public Power Supply System ("WPPSS" or "Supply System") is also named as a respondent. Claims against the Supply System are similarly dismissed for lack of jurisdiction.[4]

Petitioners are challenging the settlement agreement (embodied in several documents) entered into by respondent BPA and the IOUs as a partial resolution of the case of *Bonneville Power Admin. v. Washington Pub. Power Supply Sys.*, C–82–1252 (Browning, J.) (W.D.Wash.) (*"BPA v. WPPSS"*). The settlement agreement resolves the dispute over the "mothballing" of the Supply System's partially-constructed Nuclear Project 3 reactor ("WNP–3"). Collectively, the IOUs owned thirty percent of WNP–3. The Supply System owned seventy percent of the project. Under the initial agreements (Net Billing Agreements), the Supply System was the agent for the IOUs in constructing the plant. The IOUs exercised their ownership rights through a committee, established by contract, called the "Owners Committee."

The Net Billing Agreements required the Supply System to sell its 70 percent share of the output of WNP–3 to the 103 "participant" utilities, which in turn assigned their respective shares of the output to BPA. These agreements required BPA ultimately to pay for the Supply System's 70 percent of all costs associated with WNP–3. During construction, the Supply System was to finance these costs with borrowed funds, to be repaid later through power sales by BPA.

In 1983, BPA recommended that construction of WNP–3 be delayed and the plant "mothballed." The reasons were that the Supply System could no longer sell bonds and that the projected need for power in the Northwest did not support con-

---

**1.** Claims of certain of the original petitioners, Michael Rose, Michele Ryan, David McTeague and the Utility Reform Project, have been dismissed pursuant to their own motions for voluntary dismissal.

**2.** BPA's actions are governed by four statutes: the Regional Act; the Bonneville Project Act, 16 U.S.C. § 832 *et seq.;* the Pacific Northwest Power Preference Act, 16 U.S.C. §§ 837 *et seq.;* and the Federal Columbia River Transmission System Act, 16 U.S.C. §§ 838 *et seq. See generally California Energy Resources Conservation and Dev. Comm'n v. Bonneville Power Admin.,* 831 F.2d 1467, 1470 (9th Cir.1987), *cert. denied,* — U.S. —, 109 S.Ct. 58, 102 L.Ed.2d 36 (1988). The four enabling statutes are to be read in *pari materia. Dep't. of Water and Power of City of Los Angeles v. Bonneville Power Admin.,* 759 F.2d 684 (9th Cir.1985).

**3.** The Regional Act, 16 U.S.C. § 839f(e)(5), does not confer original jurisdiction upon this court for claims against parties other than the Bonneville Power Administration. Our direct review jurisdiction extends solely to challenges to agency actions and provides no basis for suits asserting claims based on actions by private parties. 16 U.S.C. § 839f(e)(5). Nor does this court recognize pendent party jurisdiction; there must be an adequate independent ground for jurisdiction to add affirmative claims against an additional party. *See, e.g., Carpenters Southern California Admin. Corp. v. D & L Camp Constr. Co.,* 738 F.2d 999 (9th Cir.1984); *Safeco Ins. Co. v. Guyton,* 692 F.2d 551 (9th Cir.1982). This court consequently lacks jurisdiction over all claims asserted against both the Supply System and the IOUs. *Aldinger v. Howard,* 427 U.S. 1, 96 S.Ct. 2413, 49 L.Ed.2d 276 (1976); *Ayala v. United States,* 550 F.2d 1196, 1198–1200 (9th Cir.1977), *cert. dismissed,* 435 U.S. 982, 98 S.Ct. 1635, 56 L.Ed.2d 76 (1978); *Blake v. Pallan,* 554 F.2d 947 (9th Cir.1977). Those claims are accordingly dismissed.

**4.** *See* footnote 3, *supra.*

struction of an additional nuclear power plant. A halt to construction followed, and in 1983 the IOUs brought an action in district court challenging the suspension. *BPA v. WPPSS.*

In that suit against BPA, WPPSS and the 103 utilities that had signed the Net Billing Agreements, the IOUs claimed that these agreements prohibited the construction delay and obligated BPA to pay the costs of construction out of its current revenues if other funds were unavailable.

District Judge Richard Bilby ruled against Bonneville and the Supply System. Judge Bilby held that the Ownership Agreements require BPA to fund construction costs out of its current revenues and that BPA and WPPSS had breached the Agreement by delaying construction of Project 3. He reserved for later adjudication the issues of whether any breach was material and whether there were recoverable damages. Judge Bilby then recused himself. Judge William Browning took over for Judge Bilby and vacated all of Judge Bilby's rulings. On July 10, 1985, Judge Browning reinstated most of Judge Bilby's rulings except for the ruling on the IOU claims for breach of contract.

In September 1985, BPA, the IOUs and the Supply System executed various documents embodying a settlement of the WNP–3 construction delay claims. It is this settlement that petitioners now challenge.

*The Settlement Agreement*

The settlement agreement provides that BPA, over a 30 year period, will transfer to the IOUs an amount of power intended to equal that which WNP–3 would have generated for the IOUs if it had been completed, with a downward adjustment to reflect the fact that the IOUs had not completed their total capital investments in the interrupted project.[5] The calculation of the amount of power that would have been produced by WNP–3 is based on the average performance of four surrogate nuclear plants of design and size similar to WNP–3.

Since the IOUs would have paid operation and maintenance costs on power received from WNP–3, they will make payments to Bonneville based on the average costs of the surrogate plants. The IOUs will be reimbursed for preservation costs of WNP–3 that they would not have incurred had the plant been completed.

In return for BPA power, the IOUs are obligated to make an equal amount of energy available to BPA annually. If BPA chooses to accept this energy, it pays for it at the IOUs higher costs. The availability of the IOU energy, in amounts equal to its obligations, will assure Bonneville's ability to meet its other firm contractual commitments.

The agreements for the exchange of power also contained a "fallback" agreement that took effect if the power exchange were held to be invalid. In essence, the fallback agreement provided for BPA to pay cash to the IOUs so that they could purchase the power BPA would have provided them in the exchange.

As a further part of the settlement agreement, the IOUs irrevocably offered to BPA their 30 percent share of WNP–3 project capability (the electrical generating capability of the plant). BPA has not accepted the offers and, under the terms of the offers, cannot do so until after it satisfies the resource acquisition procedures of the Northwest Power Act. 16 U.S.C. § 839d(c). If BPA decides to restart construction of WNP–3, it will acquire the IOUs' shares of project capability and reimburse them for their costs to complete the project. If the plant is restarted, of course, there will no longer be any preservation costs, and BPA's duty to reimburse the IOUs for these costs will end.

The IOUs, in turn, agreed not to cast their WNP–3 Owners Committee votes contrary to BPA, except as to certain matters relating to cost-sharing, or if they are otherwise legally required to do so.

---

5. The exchange agreement signed by Pacific Power & Light Co., one of the IOUs, differs from the others in that Pacific does not automatically join the exchange, but has an option to do so at any time before 1996.

442

Finally, the parties covenanted not to proceed further in the mothballing litigation against each other, and agreed to dismiss the claims in that suit. Only if the IOUs lose the benefits of the exchange agreement (and the fallback), and the right to reimbursement of WNP–3 costs, may they reopen the litigation, and then only to seek prospective relief from their obligations under the Ownership Agreement for WNP–3.

*Issues*

The petitioners contend that the settlement agreement violates a number of statutory restrictions on BPA's operating authority. The significant issues they present may be consolidated as follows:

(1) Is the purported exchange of power between BPA and the IOUs actually a "sale" of power to the IOUs, entered without adherence to restrictions on sales found in § 5(a) of the Bonneville Project Act, 16 U.S.C. § 832d(a), or to the ratemaking procedures found in the Regional Act, 16 U.S.C. § 839e?

(2) If the proposed transaction is properly regarded as an exchange, does it meet the requirements for "mutual exchanges of unused excess power" under the Bonneville Project Act, 16 U.S.C. § 832d(b)?

(3) Whether it is a sale or exchange, does the proposed transaction violate the preference accorded public utilities and cooperatives in the Bonneville Project Act, 16 U.S.C. § 832c(a), or the Regional Act, 16 U.S.C. §§ 839c(a) and 839g(c)?

(4) If the proposed transaction is an exchange, is it nevertheless subject to the restrictions and ratemaking procedures applicable to sales?

(5) Does BPA's receipt of an irrevocable offer to acquire the IOUs' share of the project capability of WNP–3 constitute an "acquisition" of a major resource, subject to the provisions of Section 6(c) of the Northwest Power Act, 16 U.S.C. § 839d(c)?

(6) To what extent are the answers to all of the above questions colored by the broad authority of the Administrator of BPA to settle claims under section 2(f) of the Bonneville Project Act, 16 U.S.C. § 832a(f)?

(7) Was BPA required to prepare an environmental impact statement, under the provisions of the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4332(2)(c)? Do petitioners have standing to raise this issue?

(8) Did BPA's settlement violate contracts between BPA and petitioners? May those contractual claims be raised in this proceeding?

*Standard of Review*

Under the Northwest Power Act, 16 U.S.C. §§ 839f(e)(1)–(3), we review final actions of Bonneville by the standards of the Administrative Procedure Act. 5 U.S.C. § 706. BPA's action will therefore be set aside if it is "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). While we review de novo questions of statutory construction, *see Native Village of Stevens v. Smith,* 770 F.2d 1486, 1487 (9th Cir.1985), *cert. denied,* 475 U.S. 1121, 106 S.Ct. 1640, 90 L.Ed.2d 185 (1986), we accord substantial deference to interpretations of an agency charged with administering the statute in issue. *Blackfeet Indian Tribe v. Montana Power Co.,* 838 F.2d 1055, 1058 (9th Cir.), *cert. denied,* —— U.S. ——, 109 S.Ct. 79, 102 L.Ed.2d 56 (1988). Deference is especially appropriate in the present case because the enabling legislation is highly technical and because BPA was intimately involved in drafting much of that legislation. *Dep't of Water & Power of City of Los Angeles v. Bonneville Power Admin.,* 759 F.2d 684, 691 (9th Cir.1985). Thus, we will uphold BPA's interpretations of the Bonneville Project Act and the Regional Act if they are reasonable.[6] *Aluminum Co. of America v. Central Lincoln Peoples' Utility Dist., ("ALCOA")* 467 U.S. 380, 104 S.Ct. 2472, 81 L.Ed.2d 301 (1984);

---

**6.** "This court need not find that the BPA interpretation of the [ ] statutes 'is the only reasonable one, or even that it is the result we would have reached had the question arisen in the first instance in judicial proceedings.'" *Dep't of Wa-* ter & Power, 759 F.2d at 693 (citing to *Aluminum Co. of America v. Central Lincoln People's Utility Dist.,* 467 U.S. 380, 104 S.Ct. 2472, 81 L.Ed.2d 301 (1984)).

accord, *California Energy Resources Conservation and Development Comm'n v. Bonneville Power Admin.,* 831 F.2d 1467, 1472 (9th Cir.1987), *cert. denied,* — U.S. ——, 109 S.Ct. 58, 102 L.Ed.2d 36 (1988).

*BPA's Settlement Authority*

■ In answer to the sixth issue set forth above, we are firmly of the view that this case is heavily colored by the fact that it is a *settlement* that we are reviewing. BPA was facing a claim in which the IOUs estimated their damages as exceeding $2.5 billion; they already had invested some $800 million in WNP–3. The litigation promised to assume epic proportions. There was clearly an overriding public interest in settling the controversy. *See, e.g., United States v. McInnes,* 556 F.2d 436, 441 (9th Cir.1977); *Van Bronkhorst v. Safeco Corp.,* 529 F.2d 943, 950 (9th Cir. 1976). This is not to say that BPA could act contrary to a clear statutory directive in settling, but if there is room for doubt, we ought not to resolve it in a manner that sends the parties back to litigation. This settlement will therefore be set aside only for the strongest of reasons. *See Cities Serv. Oil Co. v. Coleman Oil Co.,* 470 F.2d 925, 929 (1st Cir.1972), *cert. denied,* 411 U.S. 967, 93 S.Ct. 2150, 36 L.Ed.2d 688 (1973).

BPA's authority to settle this claim derives from § 2(f) of the Bonneville Project Act, 16 U.S.C. § 832a(f), added in 1945.[7] That section provides that "the Administrator is authorized to enter into such contracts ... and the compromise or final settlement of any claim arising thereunder...."[8] The unrestricted language of the statute gives the Administrator expansive authority to settle contract claims.

The legislative history of the Act confirms the point:

The section also permits the Administrator to compromise claims arising out of contracts he has executed. The Administrator is a responsible officer of the Government and is the one who is most familiar with the claim and the facts out of which it arose. The discretion to compromise and settle it should be a part of Bonneville's business operations. It should not be compelled to lose, or run the risk of losing, advantageous settlements because of the delays involved in sending offers back and forth across the continent for consideration by a number of agencies before acceptance is possible.

H.R.Rep. No. 777, 79th Cong., 1st Sess. (1945), *reprinted at* 1945 U.S.Code Cong. Service 874, 875.[9] The Supreme Court has also described the latitude to be accorded to the Administrator:

It is the responsibility of the Administrator to manage the complex relationship among these various aspects of the statute, and, absent an express statutory statement requiring particular terms in the contracts, it is appropriate that we give him broad discretion to determine them.

*ALCOA,* 467 U.S. at 400, 104 S.Ct. at 2484. Petitioners' specific challenges to the settlement agreement are therefore reviewed in light of the broad settlement authority provided to the Administrator by Congress. It is from that perspective that we now review petitioners' contentions.

*Sale v. Exchange*

■ The crux of the settlement agreement involves the transfer of power from

---

7. Petitioners contend that the settlement authority of the Administrator is limited to $1,000 by 16 U.S.C. § 832k(a). That section, however, relates only to the settlement of tort claims.

8. 16 U.S.C. § 832a(f) provides as follows: "Subject only to the provisions of this chapter, the Administrator is authorized to enter into such contracts, agreements, and arrangements, including the amendment, modification, adjust-

ment, or cancelation thereof and the compromise or final settlement of any claim arising thereunder, and to make such expenditures, upon such terms and conditions and in such manner as he may deem necessary."

9. BPA's settlement authority was specifically preserved under the provisions of section 9(a) of the Regional Act. 16 U.S.C. § 839f(a).

BPA to the IOUs and a return obligation from the IOUs to BPA. The parties to the settlement have referred to this transfer as an exchange of power. Petitioners dispute this characterization and argue that the transaction is in reality a "sale" of power to the IOUs by the BPA. The Administrator's authority to carry out sales of electric power is contained in section 5(a) of the Bonneville Project Act, 16 U.S.C. § 832d(a):

> Subject to the provisions of this chapter and to such rate schedules as the Secretary of Energy may approve, as provided in this chapter, the administrator shall negotiate and enter into contracts for the sale at wholesale of electric energy, either for resale or consumption. . . .

16 U.S.C. § 832d(a). Such contracts of sale are limited to twenty years duration, and are subject to review and, in certain cases, cancellation at five year intervals. *Id.*

Petitioners contend that the transaction at issue is a "sale" and not an "exchange," because BPA assumes an obligation to make energy and power deliveries to the IOUs or to make cash payments to the IOUs when Bonneville is unable to make deliveries of power to the IOUs from the federal system. The IOUs, on the other hand, are only expected to make energy available to BPA (at higher cost) to the extent necessary to enable BPA to meet its commitment to the IOUs. This, say the petitioners, is a sale of power to the IOUs with the IOUs providing the back-up should Bonneville not have enough power to sell to them. Because the sale exceeds the permissible duration under § 5(a), and fails to meet other statutory conditions imposed on sales, petitioners contend that the transaction is void.

Petitioners argue that the case of *City of Santa Clara v. Andrus*, 572 F.2d 660, 669 (9th Cir), *cert. denied*, 439 U.S. 859, 99 S.Ct. 177, 58 L.Ed.2d 167 (1978), supports their argument. In *Santa Clara*, this court voided a "sale" of federal power to a privately owned utility where such a transaction was in violation of the preference clause contained in section 9(c) of the Reclamation Project Act. In *Santa Clara*, however, the issue was not whether the transaction had been an exchange; it was plainly a sale. *Id.* Most critically, the sale in that case was carried out during a time when a preference customer was having its allotment reduced, over its objection. *Id.* at 670. In the present case, unlike *Santa Clara*, BPA's right to obtain exchange energy means that there will be no net diminution to the federal system. BPA will therefore continue to have the ability to meet its preference customers' needs.

At least in the context of this settlement agreement, we conclude that the proposed transaction is properly viewed as an exchange, rather than a sale, of power. It is structured as an exchange. Bonneville and the IOUs are to make available to each other an equivalent quantity of energy in each contract year. Their obligations differ with respect to the times of delivery and rates of delivery of the electric energy. These different obligations make the exchange economical and mutually beneficial to the parties and take advantage of the different characteristics of their systems. BPA's obligations are therefore compressed into relatively few months of each year when it is beneficial to BPA. That the actual exchange may not always occur,[10] or that the transaction includes cost equalization payments or other attributes serving other goals of the settlement, is not fatal to the transaction's character as an exchange.

---

**10.** We reject petitioners' contention that the transaction is not an exchange because BPA is not required to accept the energy made available by the IOUs. BPA may have cheaper power available, depending on circumstances at the time. The point is that the IOUs are bound to the exchange if BPA needs it.

*Validity of the Exchange Under 16 U.S.C. § 832d(b)*

■ Section 5(b) of the Bonneville Project Act, 16 U.S.C. § 832d(b), provides:

The administrator is authorized to enter into contracts with public or private power systems for the mutual exchange of excess power upon suitable exchange terms for the purpose of economical operation or of providing emergency or breakdown relief.

Petitioners contend that the exchange proposed in the settlement agreement fails to comply with section 5(b) because it is not "mutual." Repeating their arguments urging that the transaction is really a sale, they contend that the IOUs receive from BPA far more than they give back. Petitioners elaborate by pointing out that BPA is not obligated to accept the energy that the IOUs are required to make available. BPA may refuse this energy, and will do so if other, cheaper sources of energy are available to meet BPA's requirements.

Petitioners advance little reason for characterizing this arrangement as other than mutual except that the obligations of each party are not identical. The only statute which characterizes a "mutual exchange" provides that exchanges be for "the purpose of economical operation." 16 U.S.C. § 832d(b). This measure gives the Administrator broad leeway in structuring exchanges. Economical operation will rarely, if ever, be served by an exchange of identical obligations.

"Because this exchange program essentially requires BPA to trade its cheap power for more expensive power, it is obviously a money-losing program for BPA. The Act expressly contemplates that much of the cost of this program is

to be covered by power sales to DSIs, [direct service industrial customers] which pay a considerably higher price for power than other users."

*ALCOA,* 467 U.S. at 399, 104 S.Ct. at 2484. We conclude, therefore, that the exchange proposed by the settlement agreement is "mutual" within the meaning of section 5(b).[11] *See Central Elec. Co-op. Inc. v. Bonneville Power Admin.,* 835 F.2d 199, 200 (9th Cir.1987) ("This program subsidizes the residential rates of the IOU's.... Section 839c(c)(1) disguises this subsidy as a fictional exchange of power between BPA and the utilities").

*Preference Provisions* [12]

■ The Bonneville Project Act provides that "the administrator shall at all times, in disposing of electric energy generated at said project, give preference and priority to public bodies and cooperatives." 16 U.S.C. § 832c(a). The preference is reiterated in the Regional Act, 16 U.S.C. §§ 839c(a) and 839g(c). These priorities, however, apply only when there are competing applications for power. *ALCOA,* 467 U.S. at 393, 104 S.Ct. at 2481 ("the preference system merely determines the priority of different customers when the Administrator receives 'conflicting or competing' applications"). *See also City of Anaheim v. Duncan,* 658 F.2d 1326, 1331 (9th Cir.1981) ("The preference clause was enacted so that municipalities and other public entities would receive first call on the low-cost power.") The preference clause therefore merely defines the order of purchasers. Because there are no competing applications present in this case, there is no preference to satisfy.[13]

**11.** Some of the petitioners argue that the exchange does not comply with section 5(b) because the power to be transferred by BPA is not "excess." The Administrator, however, determined otherwise, and petitioners have not shown that determination to be arbitrary.

**12.** BPA's motion to dismiss claims based on preference for lack of standing is denied. Al-

though petitioners' claims fail on the merits, they allege sufficient injury to support standing. *Allen v. Wright,* 468 U.S. 737, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984).

**13.** Our disposition of this issue makes it unnecessary for us to address BPA's contention that the preference provisions are wholly inapplicable to exchanges of power.

Petitioners nevertheless argue that the settlement agreement violates the preference provision because BPA has "blocked off" a portion of its firm energy and power reserves. Petitioners necessarily refer to a possible future need, because all of their current needs are being met. The threat to petitioners' future needs is speculative at best. The settlement causes no net diminution in energy available in the federal system because the BPA has the right to receive from the IOUs an amount of energy equal to that which it delivers to them. We will not disrupt the settlement because of a conjectural conflict. *City of Anaheim*, 658 F.2d at 1330.

*Rate Schedules* [14]

■ Petitioners argue that, whether the transaction is styled a sale or an exchange, BPA still must comply with rate-making procedures. In order to determine whether BPA action is rate-making, we must consider the totality of circumstances. *California Energy*, 831 F.2d at 1473 ("access policy" for high voltage lines to southwest not rate-making) (citing *Portland General Elec. Co. v. Johnson*, 754 F.2d 1475 (9th Cir.1985) and *California Energy Resources Conservation and Dev. Comm'n v. BPA*, 754 F.2d 1470 (9th Cir.1985), *cert. denied*, 474 U.S. 1005, 106 S.Ct. 524, 88 L.Ed.2d 457 (1985)). We have already determined that this transaction is an exchange; we now consider whether the statutory rate-making procedures apply to it.

Nothing in the statutory structure suggests that an exchange like the one in issue is subject to ratemaking procedures. Section 5(a) of the Bonneville Project Act provides that the Administrator shall enter contracts for "sale" of electric energy to public bodies, cooperatives and private agencies, and for "disposition" of electric energy to federal agencies. 16 U.S.C.

§ 832d(a). The "disposition" provision was added in 1945 because the term "sale" was inapplicable to transfers to agencies within the federal government. *See* H.R.Rept. No. 777, *reprinted at* 1945 U.S.Code Cong. Service 874, 876. Unlike some of the petitioners, we do not believe that the reiteration of the terms "sale and disposition" in ratemaking provisions of the Regional Act, *e.g.*, 16 U.S.C. § 839e(a)(1), was meant to apply ratemaking procedures to an exchange like the one before us. Nor have the petitioners demonstrated that these ratemaking procedures have been imposed in the past upon exchanges of power by BPA.

In an exchange, the transfer of power back and forth between the parties is the essence of the transaction. The Administrator may exchange power upon "suitable exchange terms" for the economical operation of the system or for emergency and breakdown relief. 16 U.S.C. § 832d(b). In this settlement, the payments that BPA will receive from the IOUs are not intended as rates. They are not made for the purpose of compensating BPA for the cost of power, but are intended instead to put the IOUs in the same position they would have been in had the mothballing of WNP–3 never occurred. The IOUs are left making payments for the operation and maintenance of a nuclear plant. The terms of the exchange were intended to achieve economical operation of the system by permitting BPA to recover, if it needed to do so, energy equivalent to that which it delivered to the IOUs as part of the settlement. Rate-making procedures for sales are intended to recover the "cost of producing and transmitting such electric energy." 16 U.S.C. § 832f. These procedures would not serve the purpose for which they were designed if they were required to be applied to this exchange. [15]

14. BPA's motion to dismiss claims dealing with rates for lack of final action is denied. The settlement agreement is final agency action subject to review and the rate-making claims cannot be divorced from the agreement.

15. For a general discussion of rate-making procedures see *Atlantic Richfield Co. v. Bonneville Power Admin.*, 818 F.2d 701 (9th Cir.1987) ("Customer charge" to DSIs are rates and are justified in order to recoup BPA costs); *City of Seattle v. Johnson*, 813 F.2d 1364 (9th Cir.1987)

*Acquisition of Major Resource*

█ Under the settlement agreement, BPA agrees to reimburse the IOUs for the costs of mothballing WNP-3 and receives an irrevocable offer to acquire the IOUs' share of WNP-3. The settlement agreement further provides that, if BPA should choose to restart construction of the reactor or otherwise dispose of it, BPA will then follow the procedures for a major resource acquisition set out in the Regional Act. 16 U.S.C. § 839d(c).

WNP-3 was under construction when the Regional Act was passed in December of 1980 and its eventual completion was assumed. The net billing obligations underlying the project were upheld by this Court. See *City of Springfield v. WPPSS,* 752 F.2d 1423 (9th Cir.1985), *cert. denied,* 474 U.S. 1055, 106 S.Ct. 792, 88 L.Ed.2d 770 (1986). BPA now owns 70 percent of the reactor and would have to pay the costs of mothballing to protect its investment whether the terms of the settlement were approved or rejected. The mothballing expenses are charged to BPA in the settlement because the IOUs would not have incurred these costs had Bonneville not insisted on the halt to construction.

Petitioners argue that by virtue of the irrevocable offer and the assumption of the IOU's preservation costs, BPA has in effect acquired the IOUs' interest in WNP-3. This acquisition, they contend, is a major resource acquisition subject to the Regional Act's procedural strictures. The Regional Act requires public hearings and other measures prior to such an acquisition. 16 U.S.C. § 839d(c)(1). A "major resource" is one that "has a planned capability greater than fifty average megawatts, and if acquired by the Administrator, is acquired for a period of more than five years." 16 U.S.C. § 839a(12)(A), (B).

To characterize BPA's action as an acquisition we would have to accept the proposition that BPA now owns the IOUs' share of WNP-3 generating capability. That we refuse to do. The unexercised option gener-

ates no power, and it adds no capability to BPA's system. Petitioners have referred us to no case or statute that makes an offer an acquisition.

The purpose of section 839d(c) is to assure that BPA does not burden the region with costly projects. Restart and completion of WNP-3 would obligate BPA and, presumably, its customers to pay many millions of dollars. It is the exercise, not the existence, of the option that would impose such costs. The settlement agreement provides that if the option is exercised and WNP-3 restarted, BPA will have to comply with the acquisition procedures of the Regional Act. There is no evasion of the Act.

In light of these circumstances, and of the deference due to the Administrator's construction of the applicable statutes, we conclude that the settlement's irrevocable option is not a major resource acquisition.

*Environmental Impact Statement*

█ Petitioners contend that BPA's settlement is a major federal action significantly affecting the environment, requiring BPA to prepare an Environmental Impact Statement ("EIS") under the terms of the National Environmental Policy Act (NEPA). 42 U.S.C. § 4332(2)(C). They argue that the settlement qualifies partly because it a long term contract. *Forelaws on Board v. Johnson,* 743 F.2d 677, 682 (9th Cir.1984), *cert. denied,* 478 U.S. 1004, 106 S.Ct. 3293, 92 L.Ed.2d 709 (1986).

BPA conducted two Environmental Assessments ("EA") which resulted in a Finding of No Significant Impact ("FONSI"). Petitioners have made no effort to demonstrate that the Finding was erroneous. Moreover, they have not shown any connection between themselves and any projected harm or injury to the environment. *Sierra Club v. Morton,* 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972). The only interest advanced by petitioners is an economic one that lies outside the zone of interest protected by NEPA. *See Association of Data Processing Service Organiza-*

("availability charge" is a rate; final action by FERC is therefore required for federal judicial

review); *California Energy,* 831 F.2d 1467.

*tions, Inc. v. Camp,* 397 U.S. 150, 153, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970). The environmental claims of petitioners are therefore dismissed for lack of standing.

*Contract Claims*

■ SUG claims that it is a third party beneficiary to the Ownership Agreement and the Project Agreement and that these contracts cannot be modified without its consent. SUG also claims tortious interference with contractual relationship. These are nonstatutory claims, apart from the administrative record, and are therefore not encompassed by the Act's grant of jurisdiction to this court, 16 U.S.C. § 839f(e)(5). *Public Utility District No. 1 of Clark County v. Johnson,* 855 F.2d 647 (9th Cir.1988). We dismiss these claims as well as all other state law claims for lack of jurisdiction.

*Additional Contentions*

Petitioner Washington Group invokes section 6(k) of the Regional Act, 16 U.S.C. § 839d(k), which requires BPA "to insure that benefits under this section ... are distributed equitably throughout the region." Washington Group contends that the settlement violates this provision by rescuing the IOUs at the expense Washington Group and other Bonneville ratepayers.

There is considerable force in BPA's responding argument that the requirement of equitable distribution is so vague and discretionary a standard that it provides no law upon which to base judicial review. We need not decide that question, however, for we conclude that Washington Group has not made its case. It is true, as Washington Group contends, that under the settlement agreement the IOUs "have replaced the uncertainty of nuclear power plant construction, completion and operation with the certainty and reliability of the federal system." Washington Group Opening Brief, p. 46. It is not so clear, however, that the IOUS have, as Washington group suggests, made this substitution on "economically advantageous quantity, price

and delivery terms." *Id.* The price for the IOUs' power will still have to be determined according to rates charged at other, comparable nuclear power plants.

Nor is the settlement without benefit to all participants in BPA's power system. The settlement ended protracted and costly litigation. The sales of BPA's power to the IOUs, which the IOUs must accept, is of benefit to BPA. The settlement must not be evaluated apart from the profound economic problems that stimulated it, nor may the cause of those difficulties be charged to the settlement. We reject, therefore, Washington Group's claim based on section 6(k) of the Regional Act.

Petitioner's related argument that the costs of settlement will be unfairly imposed upon BPA's ratepayers is premature. Whether any particular costs are allocated to rates is a subject for ratemaking proceedings. Until the costs are allocated to rates, and the rates made final, petitioners' argument is premature.

Various of the petitioners have advanced other, more tangential statutory arguments. We have reviewed them all and find them to be without merit.

## CONCLUSION

Petitioners' challenge to the settlement agreement is rejected. The power transfer qualifies as an exchange. The exchange and the remaining parts of the agreement are in accordance with the governing statutes.[16]

Petitioners' state law claims are dismissed for lack of jurisdiction. All claims for affirmative relief against the Supply System and the IOUs are also dismissed for lack of jurisdiction.

AGENCY ACTION AFFIRMED.

ALL OTHER CLAIMS OF PETITIONERS DISMISSED.

---

16. Because we uphold the primary settlement agreement, we need not deal with petitioners' challenges to the "fallback" provisions.